SHAME ON YOU PRODUCTIONS, INC., Plaintiff,

v.

ELIZABETH BANKS, an individual; Max Handelman, an individual; Steven Brill, an individual; Brillco, Inc., a California corporation; Focus World, a Division of Focus Features, LLC, a California corporation; Sidney Kimmel Entertainment, LLC, a California limited liability company; Filmdistrict Pictures, LLC, a Delaware limited liability company; Lakeshore Entertainment Corp., a Delaware corporation; Lakeshore Entertainment Group LLC, a California limited liability company; Broken Road Productions, Inc., a California corporation, as Doe 1; Todd Garner, an individual, as Doe 2; and Does 3–10, inclusive, Defendants.

CASE NO. CV 14–03512 MMM (JCx)

United States District Court, C.D. California.

Signed August 14, 2015

1126

Theresa E. Johnson, Charles Michael Coate, Abrams Coate LLP, Los Angeles, CA, for Plaintiff.

Devin Stone, Stephen R. Mick, Barnes and Thornburg LLP, David Aronoff, Fox Rothschild LLP, Los Angeles, CA, Grego-ry Philip Korn, Michael J. Kump, Kinsella Weitzman Iser Kump and Aldisert LLP, Santa Monica, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND MOTION FOR JUDGMENT ON THE PLEADINGS AS TO PLAINTIFF'S FEDERAL COPYRIGHT CLAIM AND DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION OVER STATE LAW CLAIM; DENYING MOTION TO CONTINUE CASE MANAGEMENT DATES AS MOOT

MARGARET M. MORROW, UNITED STATES DISTRICT JUDGE

World, Inc., Sidney Kimmel Entertainment, LLC, Filmdistrict Pictures, LLC, Lakeshore Entertainment Corp., Lakeshore Entertainment Group LLC (collectively "defendants"), and various fictitious parties.[1] The complaint alleged claims for copyright infringement and breach of implied-in-fact contract premised on defendants' purported copying of Shame on You's motion picture screenplay.

On February 25, 2015, defendants filed a motion for judgment on the pleadings.[2] On April 27, 2015, after the court granted Shame on You's *ex parte* application for an order granting it leave to amend its complaint,[3] Shame on You filed a first amended complaint alleging the same claims as the original complaint but adding Broken Road Productions, Inc. ("Broken Road") and Todd Garner as defendants.[4] The

---

1. Complaint, Docket No. 1 (May 7, 2014).

2. Motion for Judgment on the Pleadings ("MJOP"), Docket No. 110 (Feb. 25, 2015). See also Reply in Support of Motion for Judgment on the Pleadings ("MJOP Reply"), Docket No. 139 (May 4, 2015).

3. Order Granting *Ex Parte* Application for Order Granting Leave to Amend, Docket No. 133 (April. 24, 2015).

4. First Amended Complaint ("FAC"), Docket No. 135 (Apr. 27, 2015). Because the parties named in the original complaint have moved for judgment on the pleadings, while Garner and Broken Road have moved to dismiss the first amended complaint, the court refers to the parties named in the original complaint as defendants, and to Garner and Broken Road individually.

same day, it filed opposition to defendants' motion for judgment on the pleadings.[5] On May 11, 2015, all defendants, besides Garner and Broken Road, answered the first amended complaint.[6]

On May 27, 2015, Garner and Broken Road filed a motion to dismiss the first amended complaint, arguing there was no substantial similarity between the works as a matter of law.[7] The same day, Garner and Broken Road filed a motion to continue the case management dates.[8] Shame on You opposes both motions.[9]

## I. FACTUAL AND PROCEDURAL BACKGROUND

Shame on You alleges that it is the owner, by way of assignment from the author, Dan Rosen, of an original motion picture screenplay titled *Darci's Walk of Shame* ("Darci's Walk of Shame" or "Rosen's screenplay").[10] It alleges that Rosen registered an early version of the screenplay with the Writers Guild of America, East ("WGA") on or about November 17, 2006, and received registration number 145107.[11] Shame on You alleges that the assignment from Rosen as well as the relevant version of the screenplay have also been registered with the United States Copyright Office.[12]

### 1. Allegations Concerning Access

The first amended complaint alleges that on or about July 31, 2007, Rosen emailed a draft of the screenplay to an actor who was an acquaintance of Banks. Banks is a Hollywood actress and producer.[13] The acquaintance arranged a meeting among Rosen, Banks, and Banks' husband and producing partner, Handelman, to discuss the screenplay.[14] During the meeting, which purportedly lasted several hours, Rosen allegedly discussed the screenplay, detailing the plot, story, characters, sequence of events, and themes. He also purportedly gave Banks and Handelman a draft of the screenplay.[15] Shame on You asserts that Banks and Handelman expressed interest in the screenplay, and indicated they would be in touch with Rosen regarding potential production of the film.[16] Shame on You contends that, despite their apparent interest in the screenplay, Banks and Handelman never contacted Rosen after the meeting, but retained the copy of the screenplay Rosen had given them.[17]

Shame on You asserts that the screenplay was sent to various production companies and talent agencies for consideration as well; United Talent Agency, which represented both Banks and Brill, purportedly provided positive feedback.[18] In 2009,

5. Opposition to Motion for Judgement on the Pleadings ("MJOP Opposition"), Docket No. 134 (Apr. 27, 2015).

6. Answers to Amended Complaint, Docket Nos. 144 and 145 (May 11, 2015).

7. Motion to Dismiss ("MTD"), Docket No. 151 (May 27, 2015). See also Reply in Support of Motion to Dismiss ("MTD Reply"), Docket No. 167 (July 13, 2015).

8. Motion to Continue Case Management Dates, Docket No. 153 (May 27, 2015).

9. Opposition to Motion to Dismiss ("MTD Opposition"), Docket No. 165 (July 6, 2015); Opposition to Motion to Continue Case Management Dates, Docket No. 166 (July 6, 2015).

10. FAC, ¶ 16.

11. *Id.*

12. *Id.*

13. *Id.*, ¶ 17.

14. *Id.*, ¶ 18.

15. *Id.*

16. *Id.*, ¶ 19.

17. *Id.*, ¶ 20.

18. *Id.*, ¶ 21.

Rosen met with Broken Road, to which he had sent a copy of *Darci's Walk of Shame*.[19] Broken Road—which was founded by Garner, who remains its president—retained a copy of the screenplay but informed Shame on You that it was not interested in producing the screenplay.[20]

### 2. Rosen Learns of Defendants' Motion Picture *Walk of Shame*

Years later, in late 2013 or early 2014, Shame on You learned of a *Deadline Hollywood* article, which stated that Banks was starring in a motion picture titled *Walk of Shame*.[21] The article reported that Steven Brill had written the script for the film, that Focus World was the distributor, and that the film was scheduled for release on April 25, 2014.[22] Shame on You asserts that the Internet Movie Database ("IMDB") webpage for *Walk of Shame* and the promotional movie poster displayed thereon and elsewhere confirms that Banks stars in *Walk of Shame*; that Brill is the director and writer; that Sidney Kimmel Entertainment, Film District, and Lakeshore Entertainment produced the film; that Focus Features is the United States distributor; and that the film was released theatrically, digitally and on pay per view in the United States on May 2, 2014.[23]

### 3. Allegations of Substantial Similarity

Shame on You asserts that *Walk of Shame* borrows heavily from Rosen's screenplay.[24] Specifically, it alleges that the plot, stories, characters, sequence of events, themes, and incidents portrayed in the two works are fictional and, in many respects, "virtually identical."[25] It contends that these substantially similar, if not strikingly similar, elements, coupled with defendants' direct access to Rosen's screenplay through Banks and Handelman, leave "little doubt that numerous substantive original elements of [*Walk of Shame*] are compiled from the [*Darci's Walk of Shame*] [s]creenplay."[26] Shame on You pleads claims for copyright infringement under 17 U.S.C. § 101 *et. seq.*, and breach of implied-in-fact contract.[27]

### 4. Summary of the Works

Although neither of the screenplays is attached to the first amended complaint, as the court explains *infra*, the screenplays and the Walk of Shame motion picture are incorporated by reference in the complaint and can therefore properly be considered in deciding defendants' motion for judgment on the pleadings.[28] The court thus will provide a brief summary of both works before analyzing the merits of defendants' motion. There are two versions of the *Darci's Walk of Shame* screenplay; pre-

19. *Id.*

20. *Id.,* ¶¶ 12b, 21.

21. *Id.,* ¶ 22.

22. *Id.*

23. *Id.,* ¶ 23.

24. *Id.,* ¶ 24.

25. *Id.,* ¶ 24

26. *Id.*

27. See *id.,* ¶¶ 26–36 (copyright infringement), ¶¶ 37–49 (breach of contract).

28. Declaration of Devin Stone ("Stone Decl."), Docket No. 111 (Feb. 25, 215), Exh. A (*Walk of Shame* Final Shooting Script ("WOS")), Exh. B (*Darci's Walk of Shame* Screenplay ("DWOS")), Exh. B (part 2). (*Darci's Walk of Shame* Screenplay ("DWOS2")). Defendants also submitted a DVD of the Walk of Shame motion picture, which likewise is incorporated by reference in the complaint for reasons stated *infra*. See *id.,* Exh. C (Walk of Shame DVD ("WOS Movie")).

sumably only one was provided to defendants. The court cites primarily the version that is Exhibit B to the Declaration of Devin Stone, where the versions differ in any significant respect, however, it notes the differences by citing the second screenplay, which is appended as part two of Exhibit B to Stone's declaration.

### a. *Darci's Walk of Shame*

*Darci's Walk of Shame* begins in Chicago's Lincoln Park neighborhood, and focuses on lead character Darci Palter's "horribly ugly PUFFY PINK PASTRY ONE SHOULDER SOUTHERN BELLE STYLE BRIDESMAID DRESS." [29] Throughout the film, the fact that the dress—which Darci must wear as maid of honor at her younger sister Deena's wedding—is horribly ugly is used as a comedic device, since Darci is forced to make the "walk of shame" wearing the dress. The story begins as Darci, a "32 [year old], mostly natural blonde and pretty" woman, gets into a cab to pick up her boyfriend Brian at his apartment in the Beldon–Stratford hotel so that they can catch a flight to her sister's wedding in Maui.[30] Things quickly take a turn for the worse when she walks in on Brian and their travel agent, Virginia, having sex. Darci says she is going to Maui alone, and storms out of the apartment, but not before grabbing the first class upgrade Virginia had secured for the flight.

The screenplay depicts Maui as a lover's paradise. Almost all of the couples on the flight Darci takes are on their honeymoon; the flight attendant asks Darci if she is traveling alone, which prompts Darci to engage in crude rants directed at various honeymooning couples and a four-year-old girl concerning her ex-boyfriends.[31] Darci gets so inebriated she vomits in the lavatory. After arriving in Maui, Darci meets Nathan, a "36 [year old], rugged and shaggy dog handsome" man who drives a jeep taxicab.[32] Nathan serves as the romantic lead for the remainder of the screenplay. After a long conversation during the ride to the hotel, Nathan delivers Darci to the upscale Four Seasons Hotel where Darci's family—her mother, father, sister, and 101-year-old aunt Bertha—as well as the groom and his family are introduced.[33] The next several scenes include a trip to the beach, and a Hawaiian luau rehearsal dinner where Darci is forced to wear the ugly pink dress and is introduced (or reintroduced) to the man (or boy) with whom she goes home before embarking on her walk of shame the following morning. The boy, Justin, is 25, "tall, well built, and manly" with an amazing smile.[34] In one version of the screenplay, Darci's mother introduces Justin—the son of a family friend—to Darci. Justin makes it clear that he already knows Darci; Darci does not understand how this could be. It is later revealed that she used to babysit Justin as a child. In the second version of the screenplay, Justin is a bus boy at the hotel; Darci runs into him while on her way to the rehearsal dinner, and embarrasses herself by trying to mop up water that she causes him to spill on himself.[35]

The story continues the next day, as Deena, Darci, their mother, and another character, Lori, who is either a friend or extended family member, visit at the Four Seasons spa.[36] The group of women have hot cacao bath treatments and discuss their respective walks of shame. Although

---

**29.** DWOS at 1.

**30.** *Id.* at 1–2.

**31.** *Id.* at 4–6.

**32.** *Id.* at 6–8.

**33.** *Id.* at 9–11.

**34.** *Id.* at 20.

**35.** DWOS2 at 19–20.

**36.** DWOS at 23.

others tell their stories, Darci says she has never had a walk of shame. Her mother says that Darci is a "good girl," and "[n]ot like these [other] hookers," i.e., Lori and Deena.[37] The spa attendant enters and offers the women a tray of homemade chocolates. Lori, Darci and her mother try the chocolates, but Deena explains she is allergic to chocolate. The camera then zooms in on Deena covered in chocolate, with the spa attendant looking horrified.[38] The story cuts to the wedding ceremony; Deena covers her face completely with her wedding veil because she is completely covered in hives.[39]

Darci's misadventure begins at the wedding reception. Instead of having Deena toss the bouquet, as is customary, the DJ asks Darci to come up and take the bouquet. This upsets her, and she proceeds to get drunk on "giant pineapple drinks." [40] She is about to cry or throw something when Justin enters. In one version of the screenplay, he asks her to dance; in the second version, he brings her another drink, which she knocks out of his hand and kisses him.[41] In both versions, Darci and Justin wake up the following morning at the Stowaway Hotel, described as a "cheesy" two star hotel.[42] Also in both versions, Justin leaves Darci there, but offers her his car.[43]

Darci decides to take Justin's car to the Four Seasons, so she leaves the room wearing the ugly pink dress she had worn the night before. In both versions of the screenplay, Darci had left her purse at the Four Seasons, so she has no phone, wallet, or identification.[44] Once she leaves the Stowaway Hotel and sees Jason's car, she realizes that she has left the car keys in the hotel room. She has an extended discussion with the front desk clerk, explaining that she left her keys in the room; the clerk is suspicious because she cannot remember either the room number or Justin's last name.[45] Ultimately a housekeeper lets her into the room. When she returns to the parking lot, however, the car has been towed.[46] Because she needs to get back to the Four Seasons, Darci walks through a golf course, where she encounters a group of Japanese golfers.[47] She steals their golf cart and a long, comedic chase ensues. It ends with Darci stopping the golf cart in front of Bobby's Tow Yard, where Justin's car has been towed.[48]

Darci speaks with an employee, Bobby, who explains that the tow yard is closed on Sundays and that he cannot release Justin's car to her even though he just brought it in.[49] Bobby asks whether the car is registered in her name; she says it is not, and cannot even tell him Justin's last name (because she does not know it).[50] Bobby asks if she has money, and she admits she does not because her purse is at the Four Seasons.[51] Bobby feels bad for

37. *Id.* at 26.

38. *Id.* at 27–28.

39. *Id.* at 28.

40. *Id.* at 29.

41. *Id.* at 30; DWOS2 at 29–30.

42. DWOS at 30.

43. *Id.* at 32.

44. *Id.*

45. *Id.* at 34–37.

46. *Id.* at 39–40.

47. *Id.* at 41.

48. *Id.* at 42–48.

49. *Id.* at 48.

50. *Id.* at 49.

51. *Id.*

her, but explains that, although she has the keys, he cannot release the car to someone who does not even know the last name of the owner. He offers to drive her back to the Four Seasons, but only if she will go to church with him. Darci agrees.[52] When they arrive, there is a small wedding ceremony in progress at the church. Near the end of the ceremony, Darci bursts into tears and runs out of the church. Bobby follows her, and she explains that she has had trouble finding the right relationship.[53] She explains that no one she dates ever thinks she is good enough. Bobby asks whether she loved any of the men, and she responds: "What the hell does that have to do with anything?"[54] Bobby retorts, "Only everything," and goes back inside the church, leaving Darci outside.

Darci thinks she has caught a break when moments later, a pickup truck that has several dozen live chickens in the back pulls up. She rides in the back of the truck surrounded by chickens until the truck driver loses control, and Darci is thrown out of the truck into a ditch.[55] She blacks out and dreams she is marrying Brian; she is quickly awakened by Nathan—the cab driver who took her to the Four Seasons. He asks if she is all right. He explains that she has been bitten by a poisonous snake, and that he is not only a taxicab driver but a volunteer fire fighter. Based on his emergency training, he sucks the poison out of her toe.[56] A chicken that is sitting on Darci's lap then sneezes. One of several animal control workers that were trying to collect the chickens yells

quarantine; and Darci is transported to a hospital unit with Center for Disease Control and Federal Emergency Management Agency logos on the walls.[57] Nathan remains with Darci. She explains that she needs to return to the Four Seasons, and Nathan takes her in an emergency helicopter he flies from time to time.[58] Darci and Nathan discuss the fact that Nathan moved to Hawaii from Philadelphia; Nathan shares his lunch with Darci while they take in the beauty of the island. Nathan is moments away from dropping Darci off at the Four Seasons when the two have an awkward conversation about whether they will see one another again. Just as Nathan is about to land the helicopter, an emergency call comes in, and he is forced to abort the landing and head straight to a volcano to rescue a group of tourists; he and Darci soon discover the group includes her parents.[59] Darci is ashamed to see her parents, and forces Nathan to drop her off at Mendes Ranch.[60] As they say goodbye, Darci comments on the fact that Nathan is wearing a wedding ring; Nathan tries to explain, but does not have enough time, and must leave before explaining the truth.[61]

At the ranch, Darci encounters Brian and Virginia. After an extended dialogue as to why he is there, Brian tells Darci that she deserved better than him, and that he always knew she was going to dump him.[62] He offers to help her get back to her hotel. They ride on horseback together, with Virginia in the lead, to

---

52. *Id.* at 50–51.

53. *Id.* at 52–53.

54. *Id.* at 54.

55. *Id.* at 55–56.

56. *Id.* at 57–58.

57. *Id.* at 59–60.

58. *Id.* at 65–67.

59. *Id.* at 67–72.

60. *Id.* at 72–73.

61. *Id.* at 74.

62. *Id.* at 78–79.

the coast where Brian's Hummer SUV is located.[63] Once they get to the coast, Brian cannot find his keys. Darci is therefore forced to ride with what is described as a dozen native Hawaiians in an outrigger canoe.[64] After arriving at the Four Seasons, the Hawaiians tell her the ride costs $125. Fortunately, Nathan is there waiting for Darci and covers the cost.[65] Darci darts upstairs to change, avoiding anyone that might know her, while Nathan searches for the brunch Darci is supposed to attend.[66] Once upstairs, Darci decides that she will not change her dress, but will go to brunch in the bright pink dress with mud and sand all over it. She goes to the farewell brunch; it appears she is revealing her walk of shame when Nathan enters.[67] He explains that they had a romantic evening together under the stars, making her walk of shame seem like nothing more than a perfect evening.[68] At that point, Justin enters and explains what really happened, i.e., Darci went with him, but they did not have sex because she fell asleep.[69] Visibly upset, Darci races out of the hotel and hails a taxi to take her to the airport to return to Chicago.

Nathan catches her and explains that his wife died, and that he stopped wearing the ring for the first time that very day because he had feelings for her.[70] She responds that there is no chance for them, because Nathan lives in paradise and she lives in Chicago. He asks her to stay, and she says she cannot because she knows

that, like all others she has had, their relationship will not last.[71] Nathan pleads with her to no avail. Darci returns home via airplane and hails a taxi at Chicago O'Hare International Airport; it is pouring rain and there is thunder.[72] After a brief conversation with the cab driver makes her realize that she has made a huge mistake, Darci asks him to turn around and take her back to the airport.[73] She gets out of the cab at O'Hare and is shocked to see Nathan emerge from the automated double doors. Darci exclaims that Nathan has found her. Although he says at first that he merely found her sunglasses, he ultimately agrees that he followed her to Chicago. The two "KISS—finally—and it's a KISS worth waiting for. RAIN falls around them. A SHUTTLE BUS drives by SPLASHING AND SOAKING THEM."[74] Nathan asks if the weather is always like this, and Darci replies: "No—sometimes it's bad." Nathan says he will just have to get used to it, and Darci agrees that "[he] will." The movie ends with the couple kissing.[75]

#### b. *Walk of Shame*

*Walk of Shame* begins just prior to the start of a KZLA newscast with anchor Meghan Miles, the lead character. Meghan makes clear in the opening scene that she is a career woman and that she wants to become lead anchor. When her boss, Dan Karlin, tells her to be herself, she says she wants to be whatever the station wants her to be.[76] Meghan inter-

---

**63.** *Id.* at 80–83.

**64.** *Id.* at 87.

**65.** *Id.* at 88.

**66.** *Id.* at 89.

**67.** *Id.* at 95.

**68.** *Id.* at 95–96.

**69.** *Id.* at 97–98.

**70.** *Id.* at 99–100.

**71.** *Id.* at 102–03.

**72.** *Id.* at 104.

**73.** *Id.* at 104–05.

**74.** *Id.* at 107.

**75.** *Id.*

**76.** WOS at 1–2.

views with the executives who are deciding who will be selected as the new lead anchor, which seems to go well. She then goes on air, giving a very conservative, very rehearsed news presentation; during the broadcast, we are introduced to Chopper Steve, who flies the KZLA traffic helicopter.[77] He discusses "Carpocalypse"—the fact that Interstate 10 in Los Angeles will be completely shut down over the weekend. Even though Meghan has not yet been selected as lead anchor, friends Rose and Denise call and say they are going out to celebrate after the broadcast.

Rose and Denise arrive at Meghan's home in suburban Brentwood and immediately notice that much of her furniture and household items are missing.[78] Rose asks where Meghan's fiancé, Kyle, is, and Meghan says he has gone to the supermarket. Realizing that they were not fooled, Meghan then admits that Kyle broke up with her and took everything with him.[79] She says she did not tell them because she assumed that getting the lead anchor job would make it better; at that point, she burst into tears and tells her friends she did not get the job.[80] Her friends urge her to go with them to a nightclub. Meghan finally gives agrees, but says she will only go if she can wear sweat pants. Her friends respond that she must wear Denise's "slutty [yellow] dress." [81]

At the nightclub, which she has apparently not visited before, Meghan does not realize that the three shots of alcohol Den-

ise ordered were meant for all of them, and drinks all three quickly.[82] She becomes quite drunk and attempts to find a bathroom. She accidentally walks out an emergency exit, however, and is stuck on a fire escape on the second level of the building. To make matters worse, her high heel gets wedged in the grating of the fire escape and she cannot get free.[83] Just as she is about to panic, Gordon, who is a bartender at the club, comes to help her.[84] Once he gets her off the fire escape, Gordon says that Meghan is much too drunk to drive, and that he will drive her home.[85] When she apologizes for keeping him from work, Gordon explains that he is more than a bartender, as he writes books as well.[86] Gordon asks Meghan where she lives, to which she responds: "Where do YOU live?"—indicating that she wanted to go to his apartment.[87] She wakes up later that night and realizes what has happened. She finds a condom, but cannot find her clothes and other personal items. She calls her cell phone from Gordon's phone, hoping it will ring so she can find it. Instead, it goes to voicemail. She checks her voicemail and she has a message from her boss saying that she is back in the running for the lead anchor position because the other candidate has too many skeletons in her closet. He tells Meghan to get some rest, because network executives were going to come to her broadcast the following day.[88] Meghan grabs her keys, but not her purse or phone, as she remembers these are in her car, and heads outside to find the car. Much to her dismay, the car has been towed.[89]

77. *Id.* at 5–8.

78. *Id.* at 11.

79. *Id.*

80. *Id.* at 11–12.

81. *Id.* at 13.

82. *Id.* at 14–15.

83. *Id.* at 17.

84. *Id.* at 17–18.

85. *Id.* at 19.

86. *Id.* at 20.

87. *Id.*

88. *Id.* at 22–23.

89. *Id.* at 23–24.

Meghan sees a cab driver who, startled, brandishes a gun and tells her he will shoot her. He says he is off duty, but she ultimately convinces him to take her to the tow lot for "double or triple" the usual fare.[90] When the driver announces that they have reached their destination, she looks out the window and sees a sign that says "TATOO—Gentleman's Club."[91] The driver, who has a thick accent, misunderstood where she wanted to go, as he refers to the strip club as "tow to."[92] Like many other characters in the movie, the driver thought Meghan was a stripper or prostitute. When she explains she cannot pay him unless he takes to the towing company where her car is located, he demands that she either give him lap dances or he will take her to jail.[93] The driver takes his gun out a second time, threatening Meghan; she is able to escape, however, and runs toward abandoned warehouses in downtown Los Angeles. Two cars pull up; the men in both mistake Meghan for a prostitute.[94] Two police officers also notice Meghan and warn her that she cannot solicit on the street. They do not offer to help her, despite the fact that she tries to ask them to do so.[95]

Thereafter, Meghan befriends some crack cocaine dealers—Scrilla, Hulk, and Pookie.[96] At first, they believe Meghan is a police officer; Pookie then recognizes her as being on air at KZLA.[97] Meghan explains that she needs to get out of their "ghetto crack house" so she can get a big promotion. The men try to help her by giving her one of their disposable phones.[98] The only person whose number she can remember is Kyle's. He proves to be completely useless, and is in fact in bed with another woman.[99] Pookie tells Meghan how to get to the tow lot, and she heads out, but not before Pookie also gives her some crack to sell for money so she can catch a cab or bus.[100]

As the sun comes up, Meghan walks down a street with a number of stores. A store owner notices her; when she asks him for help, he accepts. He wants to take her picture, looking disheveled and wearing the yellow dress from the night before, however, which horrifies Meghan, so she runs away.[101] She next finds a person she correctly identifies as a crack dealer in a park and tries to sell him Pookie's crack; this causes a huge alteration once the dealer finds out she got the crack from his rival Pookie. Meghan throws the cocaine at a trash can and runs.[102] She jumps on a bus driven by an elderly lady; the rest of the bus patrons believe she is a prostitute. Because she has no money, the bus driver forces her to leave the bus, observing that she is not a very good prostitute if she does not have $1.50 for bus fare, and that she might want to consider a new career.[103]

Meanwhile, at Gordon's apartment, he finds Meghan's cell phone buried under clothing. He sees a text from Meghan,

90. *Id.*

91. *Id.* at 25.

92. *Id.* at 27.

93. *Id.* at 27–28.

94. *Id.* at 29–30.

95. *Id.* at 32.

96. *Id.* at 34.

97. *Id.* at 38.

98. *Id.* at 39–40.

99. *Id.* at 41–44.

100. *Id.* at 45.

101. *Id.* at 49.

102. *Id.* at 51.

103. *Id.* at 52–54.

that she sent from one of the crack dealer's phones, saying that she is lost. Gordon redials, but reaches one of the crack dealers who explains Meghan has already left his area.[104] Rose also calls Meghan's cell phone; Gordon answers. Rose interrogates him, thinking he must have killed Meghan. Rose tells Gordon to stay at his apartment as she is on her way there. Rose calls Denise and asks Denise to come with her to Gordon's apartment.[105] Meghan tries to get help from a Jewish man at a synagogue; this backfires, however, as she is accused of being a bigot or engaging in a hate crime because she is asking for $1.50.[106]

At the KZLA studio, Dan has begun to work on the script for Meghan's news broadcast; the story concerns the crazy night of the "Hooker Hudlum"; Dan does not know, however, that Meghan is the central figure in the story.[107]

Meghan finally finds a pay phone and calls 1–800–GOT–NEWS, the KZLA tip line. A young intern answers, tells Meghan she has called the tip line, and says he cannot connect her to Dan Karlin. When she explains that she is Meghan Miles, the intern does not believe her and hangs up.[108] Annoyed, Meghan slams down the phone. In the distance, she hears sirens; the police are searching for the Hooker Hoodlum.

The scene shifts to Gordon's apartment; Rose and Denise arrive, and decide that Gordon is trustworthy. Together, the three try to determine how they will find Meghan. Denise remembers that Meghan has a tracking device on her keys; Gordon says she must have taken those with her.[109] They get into Rose's car and call the tracking device company. At the same time, Meghan steals a 12–year–old boy's bicycle, and the police officers who mistook her for a prostitute begin to chase her.[110] Meghan ends up at a spa in Koreatown, where she runs into the cab driver with whom she earlier had an altercation.[111] Meghan flees, just before the police arrive due to the commotion caused by her encounter with the cab driver.[112] Denise, Rose, and Gordon arrive minutes after Meghan has fled the spa. Meghan runs along Interstate 10, which remains closed due to Carpocalypse.[113] She does not realize that the freeway will open in a matter of minutes, and decides to run across the road, miraculously beating oncoming traffic. Her whereabouts and progress are chronicled by Chopper Steve and KZLA as part of the Hooker Hoodlum story.[114]

After she successfully makes it across the interstate, Meghan finds the towing company and sees her car. The employee on duty will not release her car, however, because Meghan does not have her identification or money with which to pay the impound fees.[115] She tries to drive the car out of the lot when the gate opens, but the front desk employee pressed a button that deploys spike strips that flatten her tires. Meghan's luck finally changes, as Gordon, Rose and Denise—who have determined her location from the device attached to

104. *Id.* at 54.

105. *Id.* at 55–56.

106. *Id.* at 58.

107. *Id.* at 57.

108. *Id.* at 63–64.

109. *Id.* at 69.

110. *Id.* at 71–76.

111. *Id.* at 80–81.

112. *Id.* at 82.

113. *Id.* at 82–83.

114. *Id.* at 84–86.

115. *Id.* at 87.

her keys—arrive and whisk her off to KZLA.[116] They encounter terrible traffic because Interstate 10 has just reopened; undaunted, Meghan uses Gordon's phone to call Dan Karlin, who ends Chopper Steve to take Meghan and Gordon to the studio.[117]

After Meghan arrives at the studio, and the broadcast goes live, she realizes that the script she is reading is her story, and is completely false.[118] She gives up her desire to be what others want her to be, and tells viewers that she is the Hooker Hoodlum. She explains that she used to care about what people thought of her, but that she now just wants to be herself, because anything else is exhausting.[119] She tells the viewers that she likes Gordon— the man she stayed with the night before her walk of shame—and she thinks he likes her as well.[120] Network executives offer Meghan the opportunity to host an new "investigative series" to be called "The Girl in the Yellow Dress." Meghan says, without enthusiasm, that she will get back to them.[121] As the film ends, Gordon and Meghan leave the KZLA studio together.[122]

## II. DISCUSSION

### A. Whether Defendants' Motion for Judgment on the Pleadings Must Be Denied as Moot in Light of the Filing of the First Amended Complaint

▬ Shame on You contends that defendants' motion for judgment on the pleadings must be denied because the court granted it leave to amend the complaint,

and it filed an amended complaint on April 17, 2015. Shame on You asserts that the amended complaint moots defendants' motion, as it is directed to the original complaint and answer.[123] Defendants counter that the motion should be construed as being directed to the first amended complaint, since that complaint is substantially identical to the original complaint, and merely substitutes actual defendants for two fictitious parties.[124] Defendants also note that the amendment does not allege any new facts concerning the works at issue in this lawsuit.

The court agrees that Shame on You's filing of an amended complaint does not alter the nature of defendants' motion for judgment on the pleadings. The works at issue remain the same. Thus, the basis on which defendants seek judgment on the pleadings remains the same—i.e., defendants contend the two screenplays are not substantially similar as a matter of law. It would waste both the court's and the parties' resources to deny the motion and require defendants to file an identical motion directed to the first amended complaint. Moreover, Shame on You has not identified any prejudice it would suffer if the court elects to construe the motion as directed to the amended complaint. Under these circumstances, courts can construe motions for judgment on the pleadings as directed to later-filed complaints. See, e.g., *McQuiston v. City of Los Angeles*, 564 Fed. Appx. 303, 305–06 (9th Cir.2014) (Unpub.Disp.) ("McQuiston asserts the district court erred in considering the City

**116.** *Id.* at 91–92.

**117.** *Id.* at 94.

**118.** *Id.* at 96.

**119.** *Id.* at 97–98.

**120.** *Id.*

**121.** *Id.* at 100.

**122.** *Id.* at 101.

**123.** Opposition at 1.

**124.** Reply at 3.

Defendants' motion for judgment on the pleadings. McQuiston argues the district court should have dismissed that pleading, which was directed at the second amended complaint, as moot and directed the City Defendants to file a new motion directed at the third amended complaint. This argument is frivolous. As regards to the City Defendants, McQuiston's claims, factual allegations, and legal arguments did not change in any material way from the second to the third amended complaints. Furthermore, McQuiston filed an extensive memorandum of points and authorities responsive to the City Defendants' motion for judgment on the pleadings. Finally, McQuiston has not identified any prejudice flowing to him from the district court's decision to treat the City Defendants' motion as applying to the third amended complaint and considering that motion, along with his response, in resolving this case," citing FED. R. CIV. PROC. 1 (stating the rules of civil procedure "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding")); *Mohs v. Trans World Corp.*, 993 F.2d 1550 (7th Cir.1993) (affirming the district court's decision to "treat defendants' motion for summary judgment as a motion directed to both the original and amended complaint"); *Graham v. City of Oklahoma City, Okl.*, 859 F.2d 142, 144–45 (10th Cir.1988) ("Mr. Graham first argues that the judgment was improperly entered because defendants failed to renew their motion for summary judgment after he filed an amended complaint naming additional defendants. Mr. Graham correctly contends that an amended complaint supersedes the original complaint unless it is specifically incorporated therein. The amended complaint in this case, however, is practically identical to the original complaint except for the inclusion of additionally named defendants.... The motion for summary judgment directed towards the original complaint was fully briefed by both parties and provided Mr. Graham with adequate notice that defendants claimed he did not have a constitutionally protected property interest or a § 1985 claim. We conclude the district court had the power to enter the summary judgment on these two claims because Mr. Graham had adequate notice and sufficient opportunity to meet defendants' arguments contained in the initial motion for summary judgment"); *Banks v. ACS Educ. Corp.*, No. CV 10–1886 AJB CAB, 2011 WL 3794923, *1 (S.D.Cal. Aug. 25, 2011) ("Since the SAC did not materially alter the claims from the First Amended Complaint, but merely added Defendants previously dismissed by the Court for want of prosecution, the Court hereby construes the following motions to dismiss, and the motion for judgment on the pleadings, as motions on the SAC in an effort to avoid the needless refiling of the seven motions"); *Corpuz v. Yaneza*, No. CV 04–00752 DAE LEK, 2005 WL 2083174, *1 (D.Haw. July 15, 2005) ("The amended Complaint, however, does not add anything substantively to Plaintiffs' claims and thus, the Court construes Defendants' Motion to Dismiss as relating to Plaintiffs' Amended Complaint"); *Rogers v. Quik Check Fin., Inc.*, No. CV 03–1120 JE, 2004 WL 948339, *1 (D.Or. Mar. 16, 2004) ("Defendant's motion to dismiss asserts that plaintiff's first amended complaint fails to state a claim. However, at the hearing to consider the motion, I granted plaintiff's oral motion for leave to file a second amended complaint. Plaintiff has subsequently filed a second amended complaint, and I construe defendant's motion to dismiss as challenging the sufficiency of this latter complaint").

This is especially true given that Shame on You's opposition—although filed before the first amended complaint became oper-

ative—referenced allegations in the first amended complaint. Stated differently, although it asserted that defendants' motion for judgment on the pleadings should be denied as moot, Shame on You dedicated twenty-four of the twenty-five pages of its opposition to arguing that the motion should be denied on the merits. Shame on You also made arguments concerning Garner's and Broken Road's direct access to the screenplay. Accordingly, the court construes defendants' motion as directed to the first amended complaint, and will consider the allegations of access and substantial similarity included in that complaint to determine if it adequately states a claim against any defendant.

### B. Garner's and Broken Road's Notice of Joinder in the Motion for Judgment on the Pleadings and Defendants' Joinder in the Motion to Dismiss

Simultaneously with filing of their motion to dismiss on May 27, 2015, Garner and Broken Road joined the other defendants' motion for judgment on the pleadings.[125] On May 29, 2015, the defendants moving for judgment on the pleadings joined Garner's and Broken Road's motions to dismiss and continue the trial date.[126] Shame on You objects to the other defendants' joinder in both motions filed by Garner and Broken Road. The court agrees with Shame on You that the remaining defendants cannot join Garner's and Broken Road's motion to dismiss. See FED. R. CIV. PROC. 12(b) ("A motion asserting[, inter alia, failure to state a claim,] must be made before pleading if a responsive pleading is allowed"); Rector v. Scott, No. LA CV 13–03116 VBF, 2014 WL 580158, *1 (C.D.Cal. Feb. 11, 2014) ("Rule

12(b) goes on to say that '[a] motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed.' In other words, a motion to dismiss for insufficient service/process must be filed before an answer"); Jensen v. Douglas, No. CV 07–8119 PCT SMM, 2008 WL 4174892, *1 (D.Ariz. Sept. 5, 2008) ("A motion to dismiss under Rule 12(b)(6) 'must be made before pleading if a responsive pleading is allowed.' An answer to a complaint is a responsive pleading. Defendant filed an answer to the complaint in this matter on April 28, 2007. Relief under Rule 12(b)(6) is therefore foreclosed").

Although Shame on You does not object to Garner's and Broken Road's notice of joinder in defendants' motion for judgment on the pleadings, the court concludes that they cannot join the motion for judgment on the pleadings. This is because a Rule 12(c) motion is only proper "[a]fter the pleadings are closed but within such time as not to delay the trial." FED. R. CIV. PROC. 12(c). The "pleadings are closed for the purposes of Rule 12(c) once a complaint and answer have been filed, assuming, as is the case here, that no counterclaim or cross-claim is made." Doe v. United States, 419 F.3d 1058, 1061 (9th Cir.2005). Because Garner and Broken Road have not filed an answer, the pleadings are not closed as to them; hence, they cannot join the remaining defendants' motion for judgment on the pleadings. In fact, so long as Garner and Broken Road remain parties, the pleadings are not closed and the court cannot grant defendants' motion for judgment on the pleadings. Id. ("pleadings are closed for the purposes of Rule 12(c) once a complaint and answer have been filed, assuming, as is the case

---

125. MTD at 1.

126. Notice of Joinder by Lakeshore et al., Docket No. 156 (May 29, 2015); Notice of

Joinder by Handelman and Banks, Docket No. 157 (May 29, 2015).

here, that no counterclaim or cross-claim is made."). For that reason, the court first determines whether Garner's and Broken Road's motion to dismiss can be granted with prejudice, such that they are no longer parties and the pleadings are closed so that the court can properly decide the remaining defendants's motion for judgment on the pleadings.

### C. Legal Standard Governing Motions to Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory," or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988). The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir.1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir.1995).

The court need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' ... A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); see also *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 ("Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir.2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly*).

### D. Legal Standard Governing Motions for Judgment on the Pleadings

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party may move for judgment on the pleadings at any time after the pleadings are closed, so long as the motion is filed in sufficient time that it will not delay trial. FED. R. CIV. PROC. 12(c). "For the purposes of the motion, the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false." *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1990). "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Id.*

In deciding a motion for judgment on the pleadings, the court generally is limited to the pleadings and may not consider extrinsic evidence. See FED. R. CIV. PROC. 12(c) (stating that a Rule 12(c) motion for judgment on the pleadings should

be converted into a Rule 56 motion for summary judgment if matters outside the pleadings are considered by the court). "It is well-settled that materials properly attached as exhibits to the complaint and matters that are subject to judicial notice may ... be considered in evaluating a motion for judgment on the pleadings." *Thomas v. Fin. Recovery Servs.*, No. CV 12–01339 PSG (OPx), 2013 WL 387968, *2 (C.D.Cal. Jan. 31, 2013) (citing *Amfac Mortg. Corp. v. Ariz. Mall of Tempe, Inc.*, 583 F.2d 426, 429–30 & n. 2 (9th Cir.1978); *Buraye v. Equifax*, 625 F.Supp.2d 894, 896–97 (C.D.Cal.2008)).

██ In addition, a district court can consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.1994), overruled on other grounds in *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir.2002). The court can also consider documents on which the complaint "necessarily relies." See *Parrino v. FHP. Inc.*, 146 F.3d 699, 706 (9th Cir.), cert. denied, 525 U.S. 1001, 119 S.Ct. 510, 142 L.Ed.2d 423 (1998), superceded by statute on other grounds as recognized in *Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676 (9th Cir.2006). If the complaint references a lawsuit that is the subject of an insurance coverage dispute, for example, the court can consider the pleadings in the underlying action. *USF Ins. Co. v. Clarendon America Ins. Co.*, 452 F.Supp.2d 972, 977 n. 1 (C.D.Cal.2006).

### E. Whether the Court Must Convert Defendants' Motion for Judgment on the Pleadings and/or Garner's and Broken Road's Motion to Dismiss into Motions for Summary Judgment

██ Shame on You contends that the court must convert both the motion to dismiss and the motion for judgment on the pleadings and the motion to dismiss into motions for summary judgment because defendants and Garner and Broken Road present an "extensive comparison of the two works," and support the motions with the screenplays at issue and the motion picture *Walk of Shame*. At the hearing, Shame on You reiterated its belief that the court had converted both motions into motions for summary judgment by considering the screenplays, and thus that it would err in refusing to consider the expert opinion it proffered with its opposition. Shame on You is mistaken. As noted, Rule 12(d) states that motions to dismiss or for judgment on the pleadings shall be treated as motions for summary judgment if "matters outside the pleadings are presented to and not excluded by the court." FED. R. CIV. PROC. 12(d). "However, the [c]ourt need not turn [a] motion [to dismiss or] for judgment on the pleadings into one for summary judgment. When a party submits an indisputably authentic copy of a document, and the document is referred to in the complaint, the [c]ourt does not have to convert the motion into a summary judgment motion." *Rose v. Chase Manhattan Bank USA*, 396 F.Supp.2d 1116, 1119 (C.D.Cal.2005), aff'd, 513 F.3d 1032 (9th Cir.2008). The first amended complaint refers extensively both to the *Darci's Walk of Shame* screenplay and the allegedly infringing *Walk of Shame* screenplay. Because these works are referenced in—although not attached to—the amended complaint, they are incorporated by reference in it, and can be considered by the court in assessing substantial similarity. See *Branch*, 14 F.3d at 454; *Adjmi v. DLT Entm't Ltd.*, 97 F.Supp.3d 512, 516, 2015 WL 1499575, *2 (S.D.N.Y. Mar. 31, 2015) ("[T]he Court relies on the underlying source material: nine seasons of *Three's Company* and the screenplay (and certain reviews) of *3C*,

each incorporated by reference in the pleadings"); *Lake v. Columbia Broad. Sys., Inc.,* 140 F.Supp. 707, 708 (S.D.Cal. 1956) (finding "that copies of plaintiff's book and of the script of defendants' allegedly infringing radio program [were] . . . incorporated by reference into the complaint"). The motion picture *Walk of Shame,* based on the allegedly infringing screenplay, is also referenced repeatedly in the complaint. Thus, it too is incorporated by reference, and can be considered without converting the motion into one for summary judgment. See *Candelaria v. Spurlock,* No. CV 08–1830–BMC–RER, 2008 WL 2640471, \*1 (E.D.N.Y. July 3, 2008) ("In addition, because the complaint relies heavily on the movie, the Court may consider the movie in evaluating the complaint under Rule 12(b)(6)," citing *Brass v. American Film Techns., Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (holding that courts can consider documents incorporated by reference in the pleadings in deciding a motion to dismiss)).

▉▉▉ Thus, because defendants and Garner and Broken Road do not cite any matters outside the pleadings, the court need not convert the motion to dismiss or motion for judgment on the pleadings into a motion for summary judgment.[127]

## F. Shame on You's Objections to Defendants' Late–Filed Reply and Evidentiary Objections

▉▉▉ Shame on You objects to defendants' late-filed reply and evidentiary objections, asserting that the court should disregard the reply and objections because they were filed at 10:55 p.m. and 11:00 p.m. on May 4, 2015.[128] It argues that the court should strike the pleadings because defendants have repeatedly filed late documents and should not be permitted to continue to do so. It is true that the court requires parties to file all briefs by the close of business (5:00 p.m.) on the day they are due. Notably absent from Shame on You's objection, however, is any assertion that it was prejudiced by defendants' noncompliance. Shame on You asserts that defendants have repeatedly made late filings; this is the first time it has brought the issue to the court's attention, however, and the court lacks sufficient evidence to determine whether its assertion that the late filings are part of a pattern is accurate. Absent evidence of prejudice, the fact that defendants' reply, to which no response is permitted, and its evidentiary objections, to which Shame on You did not respond, were filed approximately six hours late is simply insufficient to warrant striking either filing. The court therefore declines to do so, and will consider both

127. Shame on You also contends, somewhat paradoxically, that defendants' motion is an untimely motion to dismiss under Rule 12(b)(6). This is so, it asserts, because defendants ask that the court "dismiss" the complaint, and cite a number of cases deciding Rule 12(b)(6) motions. Defendants' motion is captioned a motion for judgment on the pleadings; that they occasionally ask the court to "dismiss" the complaint with prejudice, as opposed to enter judgment on the pleadings, is merely a matter of semantics; if the court were to accept Shame on You's argument, it would exult form over substance. *In re Jan Weilert RV, Inc.,* 315 F.3d 1192, 1200 (9th Cir.) amended, 326 F.3d 1028 (9th

Cir.2003) ("The law does not inflexibly demand form over substance"). Furthermore, "[a] motion for judgment on the pleadings is 'functionally identical' to a . . . Rule . . . 12(b)(6) motion to dismiss." *Segal v. Rogue Pictures,* No. CV 10–5650 DSF (AJWx), 2011 WL 11512768, \*1 (C.D.Cal. Aug. 19, 2011) (quoting *Dworkin v. Hustler Magazine, Inc.,* 867 F.2d 1188, 1192 (9th Cir.1989)). Thus, reliance on Rule 12(b)(6) cases is to be expected. The court therefore declines to treat the motion as an untimely motion to dismiss.

128. Objections to Late–Filed Reply and Objections, Docket No. 141 (May 5, 2015).

the reply and the objections. See *Robinson v. Adams*, No. CV 09–6721 RSWL RC, 2010 WL 3834957, *2 (C.D.Cal. July 27, 2010) ("The Court declines petitioner's request to strike respondent's reply . . . because respondent filed his reply two days late").[129]

### G. Defendants', Garner's, and Broken Road's Objections to Shame on You's Evidence in Opposition to Their Motions

 Shame on You proffered an expert report authored by Professor Cynthia McCreery to its opposition to defendants' motion for judgment on the pleadings, and Garner's and Broken Road's motion to dismiss. In it, McCreery opines that there are numerous similarities between the two screenplays, requiring that the issue of substantial similarity be decided by a jury.[130] Defendants object to consideration of the report on several grounds. They assert primarily that the report is evidence that is neither attached to nor referenced in the first amended complaint, and cannot be considered in ruling on their motion for judgment on the pleadings. Defendants are correct that the court "cannot consider such evidence in [deciding] a motion for judgment on the pleadings · as it would require the [c]ourt to go beyond the scope of the pleadings." *XL Specialty Ins. Co. v. Perry*, No. CV 11–02078 RGK (JCGx), 2012 WL 6800780, *4 (C.D.Cal. Jan. 26, 2012). As noted, judgment on the pleadings is "improper when the district court goes beyond the pleadings," and relies on extrinsic evidence "to resolve an issue; such a proceeding must properly be treated as a motion for summary judgment." *Hal Roach Studios*, 896 F.2d at 1550 (citing FED. R. CIV. PROC. 12(c)). The same is true with respect to a motion to dismiss. See *Lee v. City of Los Angeles*, 250 F.3d 668, 688–689 (9th Cir.2001) ("As a general rule, 'a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion' "); *Santiago v. Bloise*, 741 F.Supp.2d 357, 361 (D.Mass. 2010) (refusing to consider an exhibit attached to opposition to a motion for judgment on the pleadings that was not referenced in the complaint).

Professor McCreery's expert report is extrinsic evidence on which Shame on You cannot rely at the pleadings stage. Accordingly, the court sustains both objections, and will not consider the expert report in ruling on the motions.[131] Rather, it limits its consideration to the pleadings, the screenplays, and the *Walk of Shame* motion picture. Shame on You also proffers an expert report authored by David Hayer in opposition to the motion to dismiss. The court sustains Garner's and Broken Road's objections to consideration of Hayter's expert report for the same reasons it sustained their objections to McCreery's report.[132]

---

129. Even were the court to strike the evidentiary objections, it would decline to consider the expert report of Professor Cynthia McCreery because it is extrinsic to the complaint and not properly taken into account in deciding a motion for judgment on the pleadings. The court notes as well that defendants raise no new arguments in reply; whether or not the court considers the reply, the issues before it are the same.

130. Declaration of Charles M. Coate, Docket No. 134 (Apr. 27, 2015), Exh. C (Expert Report of Professor Cynthia McCreery); MTD Opposition, Declaration of Charles M. Coates, Exh. C (same).

131. Defendants, Garner, and Broken Road also object that Professor McCreery is not qualified as an expert and that she employed an improper methodology. Since the court has declined to consider the report because it is extrinsic to the pleadings, it need not reach these additional objections.

132. Garner and Broken Road also object to Hayter's qualifications. As with McCreery, the court declines to address these objections.

At the hearing, Shame on You disputed this conclusion, asserting that the court could not conduct the extrinsic test used to assess copyright infringement without expert opinion to guide it. There is no authority for this proposition. To the contrary, courts routinely disregard expert testimony in conducting the extrinsic test, even where it is otherwise properly before the court (and in this case it is not). Where, as here, the court conducts an extensive analysis of the alleged similarities between works, and considers every alleged similarity identified by the plaintiff, it is not required to consider expert testimony concerning substantial similarity. See *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1180 (9th Cir.2003) ("The district court engaged in an extensive analysis of the alleged similarities in expressive elements between *The Mystery Magician* and the *Specials*. In deciding to disregard Kauffman's testimony, the district court could have simply deemed it unhelpful due to its abstract nature. Indeed, in the course of its written opinion, the district court analyzed and rejected the legal significance of many of the points set forth by Kauffman. The district court concluded that Rice's claims of substantial similarity were either foreclosed by the limiting doctrines of merger and *scenes a faire*, or too abstract to constitute copyright infringement. Because Kauffman's testimony merely restated many of these same generic similarities in expressive content, we are satisfied that the district court was well within its discretion in disregarding Kauffman's testimony"); *Segal v. Rogue Pictures*, No. CV 10–5650 DSF (AJWx), 2011 WL 11512768, *5 (C.D.Cal. Aug. 19, 2011) (granting judgment on the pleadings on the basis that there was no substantial similarity between two works and noting that "[t]he Court need not decide whether Plaintiff's expert" report is relevant because this order considers every alleged similarity identified by Plaintiff in his op-

position," citing *Rice*, 330 F.3d at 1180), aff'd, 544 Fed.Appx. 769 (9th Cir.2013) (Unpub.Disp.).

, Garner and Broken Road also object to the *Darci's Walk of Shame* screenplay that is attached as Exhibit B to Coates' declaration. Although the screenplay is incorporated by reference in the first amended complaint, plaintiffs rely not on the substance of the screenplay, but on a stamp on the document attached to Coates' declaration suggesting that it was received by Banks on July 31, 2007. The existence of this stamp is not pled in the first amended complaint or otherwise incorporated by reference therein, and cannot be considered in deciding the motion to dismiss. More fundamentally, as detailed below, the court finds that direct access was adequately alleged in the first amended complaint, such that consideration of the "received" stamp is unnecessary to find that Banks had access to the script. Garner's and Broken Road's objection is therefore sustained.

## H. Legal Standard Governing Copyright Infringement Claims

"Copyright is a federal law protection provided to the authors of 'original works of authorship." *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1106 (9th Cir.2010) (quoting 17 U.S.C. §§ 101–103). "To establish [copyright] infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). There is no dispute that Shame on You has a valid copyright in the *Darci's Walk of Shame* screenplay. Thus, the only issue is whether on their face, the pleadings demonstrate that no material issue of fact remains concerning copying.

"Copying may be established by showing that the infringer had access to plaintiff's copyrighted work and that the works at issue are substantially similar in their protected elements." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir.2002). For purposes of this motion, defendants do not contest access. Thus, the court must determine whether no material issues of fact remain concerning substantial similarity, such that defendants are entitled to judgment as a matter of law. See *id.* ("For purposes of their summary judgment motion, Random House and CTW did not contest ownership or access. The sole issue before us is whether any of Random House's or CTW's works were substantially similar to the Cavaliers' submissions").

"Substantial similarity is inextricably linked to the issue of access. In what is known as the 'inverse ratio rule,' [the Ninth Circuit] 'require[s] a lower standard of proof of substantial similarity when a high degree of access is shown.'" *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir.2000); *Shaw v. Lindheim*, 919 F.2d 1353, 1361–62 (9th Cir. 1990).[133]

Courts "employ a two-part analysis in this circuit—an extrinsic test and an intrinsic test—to determine whether two works are substantially similar. The 'extrinsic test' is an objective comparison of specific expressive elements." *Cavalier*, 297 F.3d at 822. See also *Funky Films, Inc. v. Time Warner Entertainment Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006) (stating that a copyright plaintiff must satisfy both an extrinsic test, focusing on objective elements, and an intrinsic test, focusing an ordinary person's subjective impressions). "[T]he [extrinsic] test focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works." *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir.1994) (internal quotation marks and citation omitted). "Familiar stock scenes and themes that are staples of literature are not protected." *Cavalier*, 297 F.3d at 823. Likewise, "[s]cenes-à-faire, or situations and incidents that flow necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement." *Id.* "Therefore, when applying the extrinsic test, a court must filter out and disregard the non-protectible elements in making its substantial similarity determination." *Id.* at 822–23; *Shaw*, 919 F.2d at 1361 (applying the extrinsic test to determine "whether there is substantial similarity between the *protected* expression of ideas in two literary works"); *Berkic v. Crichton*, 761 F.2d 1289, 1293–94 (9th Cir.1985) (rejecting consideration of general ideas as well as scènes-à-faire in determining substantial similarity under the extrinsic test).

"The 'intrinsic test' is a subjective comparison that focuses on 'whether the ordinary, reasonable audience' would find the works substantially similar in the 'total concept and feel of the works.'" *Cavalier*, 297 F.3d at 822 (citing *Kouf*, 16 F.3d at 1045 (internal quotation marks and citation omitted)). "Since the intrinsic test for expression is uniquely suited for determination by the trier of fact," *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1166 (9th Cir.1977), appellate courts "will not second-guess the jury's application of [it]." *Three Boys Music Corp.*, 212 F.3d at 485. Thus, "[i]f plaintiff satisfies the extrinsic test, the intrinsic test's subjective inquiry must be left to the jury and [any dispositive motion] must be denied." *Smith v.*

---

**133.** "Furthermore, in the absence of any proof of access, a copyright plaintiff can still make out a case of infringement by showing that the [screenplays] were 'strikingly similar.'" *Three Boys Music Corp.*, 212 F.3d at 485.

*Jackson,* 84 F.3d 1213, 1218 (9th Cir.1996); *Kouf,* 16 F.3d at 1045 ("A plaintiff avoids summary judgment by satisfying the extrinsic test which makes similarity of the works a triable issue of fact," citing *Brown Bag Software v. Symantec Corp.,* 960 F.2d 1465, 1477 (9th Cir.1992)); see also *Funky Films,* 462 F.3d at 1077 ("A 'plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests,'" quoting *Kouf,* 16 F.3d at 1045).

## I. Whether the Court Should Grant Garner's and Broken Road's Motion to Dismiss

Garner and Broken Road argue that a comparison of the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in *Darci's Walk of Shame* and *Walk of Shame* demonstrates that there is no substantial similarity in protected expression.[134] Shame on You disputes this. It argues that it has alleged Banks, Handelman, Garner, and Broken Road had direct access to the script, and that, under the inverse ratio rule, the degree of similarity that must be shown is lower than it would be were there no allegations of direct access.[135] Shame on You also contends that there are many substantial similarities between the two screenplays that render judgment as a matter of law inappropriate.[136] The court addresses each contention in turn.

### 1. Whether Shame on You Alleges That Certain Defendants Had Direct Access to Rosen's Screenplay

■ Shame on You contends that it has alleged facts that plausibly suggest

Banks, Handelman, Garner, and Broken Road had direct access to Rosen's screenplay. The court agrees. "In the context of copyright, it is well established, that there must be evidence of a reasonable possibility of access. Access must be more than a bare possibility and. may not be inferred through speculation or conjecture." *Gaste v. Kaiserman,* 863 F.2d 1061, 1066 (2d Cir.1988). To satisfy its burden of pleading access, plaintiff must allege facts "from which a reasonable finder of fact could infer that the defendant had a reasonable opportunity to copy his or her work." *Grubb v. KMS Patriots, L.P.,* 88 F.3d 1, 3 (1st Cir.1996). "Direct access is shown if there is proof that defendant actually viewed, read, or heard the work at issue." *Briggs v. Blomkamp,* 70 F.Supp.3d 1155, 1165 (N.D.Cal.2014) (citing *Lucky Break Wishbone Corp. v. Sears, Roebuck & Co.,* 528 F.Supp.2d 1106, 1122 (W.D.Wash.2007), aff'd, 373 Fed.Appx. 752 (9th Cir. Apr. 7, 2010) (Unpub.Disp.)); accord 3 William F. Patry, PATRY ON COPYRIGHT, § 9:24, at 9–55 (2007).

■ As noted, Shame on You alleges that Rosen emailed a draft of the screenplay to an actor and acquaintance of Banks on July 31, 2007. The acquaintance arranged a meeting among Rosen, Banks, and Handelman to discuss the screenplay.[137] The meeting purportedly lasted several hours, during which Rosen allegedly discussed the screenplay and detailed its plot, story, characters, sequence of events, and themes. As relevant here, Rosen also allegedly gave Banks and Handelman a draft of the screenplay.[138] These allegations plead that Banks and Handelman received both an electronic and a print version of Rosen's screenplay and give rise

---

**134.** MTD at 4.

**135.** MTD Opposition at 10–11.

**136.** *Id.* at 13.

**137.** FAC, ¶ 18.

**138.** *Id.*

to a plausible inference that Banks and Handelman "actually viewed, read, or heard the work at issue." See *Briggs,* 70 F.Supp.3d at 1165. The allegations are thus sufficient to plead that Banks and Handelman had direct access to the work.

■ The first amended complaint also alleges that sometime in 2009, Rosen met with an unidentified individual from Broken Road after he sent it a copy of *Darci's Walk of Shame* for consideration.[139] The complaint does not allege that Garner was the Broken Road representative who met with Rosen. It does plead that Garner founded Broken Road and remains its president, however; it also alleges that Broken Road retained a copy of the screenplay even after advising Shame on You that it was not interested in producing the screenplay.[140] These allegations are unquestionably sufficient to allege that Broken Road had direct access to the copyrighted work because they imply he "actually viewed, read, or heard the work at issue." See *id.* While the question respecting Garner is closer, given that he is allegedly Broken Road's founder and CEO, and that the complaint alleges he "received financial benefit for his noncredited involvement" in *Walk of Shame,* a reasonable juror could conclude that Garner, through Broken Road, had direct access to Rosen's screenplay. See *id.*

Because Shame on You plausibly alleges direct access by Garner and Broken Road, it need satisfy "a lower standard of proof to show substantial similarity" to survive Garner's and Broken Road's motion to dismiss. See *Shaw,* 919 F.2d at 1361 (quoting *Krofft,* 562 F.2d at 1172); see also *id.* (citing 2 M. Nimmer, NIMMER ON COPYRIGHT § 143.4, at 634 (1976) ("[S]ince a very high degree of similarity is required in order to dispense with proof of access, it must logi-

cally follow that where proof of access is offered, the required degree of similarity may be somewhat less than would be necessary in the absence of such proof").

Nonetheless, "the court must ... consider substantial similarity." *Universal Dyeing & Printing, Inc. v. U.S. Textile Printing, Inc.,* No. CV 09–09132 DDP (VBKx), 2011 WL 4084557, *3 (C.D.Cal. Sept. 13, 2011) (citing *Idema v. Dreamworks, Inc.,* 162 F.Supp.2d 1129, 1175–78 (C.D.Cal. 2001) (considering "substantial similarity" in a copyright action where defendants did not refute allegations of direct access and copying)). This is because neither access nor copying alone suffices to prove copyright infringement; the works must *also* be substantially similar. See *Universal Dyeing & Printing, Inc. v. U.S. Textile Printing, Inc.,* 2011 WL 5865567 at *2 (C.D.Cal.2011) ("Accordingly, even assuming that Universal had shown direct evidence of copying and access, the analysis would be the same: Defendants would still be entitled to summary judgment because the patterns at issue are not substantially similar"); *Berkla v. Corel Corp.,* 66 F.Supp.2d 1129, 1140–41 (E.D.Cal.1999) (explaining that even if plaintiff "did have evidence of direct copying ... he still remains unexcused from demonstrating the requisite similarity"); *Decorative Aides Corp. v. Staple Sewing Aides Corp.,* 497 F.Supp. 154, 157 (S.D.N.Y.1980) ("Copying cannot be found on proof of access alone when the resulting works are not substantially similar," citing *Ideal Toy Corp. v. Fab–Lu, Ltd.,* 360 F.2d 1021 (2d Cir.1966)).

### 2. Whether *Walk of Shame* and *Darci's Walk of Shame* Are Not Substantially Similar as a Matter of Law

Garner and Broken Road assert the two screenplays are not substantially similar as a matter of law.[141] As noted, "the [extrin-

---

**139.** *Id.*

**140.** *Id.,* ¶¶ 12b, 21.

**141.** MTD at 4.

sic] test focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works." *Kouf,* 16 F.3d at 1045 (internal quotation marks and citation omitted). "Familiar stock scenes and themes that are staples of literature are not protected." *Cavalier,* 297 F.3d at 823. Nor are "[s]cenes-à-faire, or situations and incidents that flow necessarily or naturally from a basic plot premise." *Id.* The court must thus examine these aspects of the screenplays to determine if it can identify articulable similarities between them.

### a. Plot

 Garner and Broken Road contend the plots of the two films are substantially different. They assert that the only possible commonality between the works is that the main character in each has difficulty walking home after a night of partying. They maintain that the concept of a walk of shame is not copyrightable, because the extrinsic test looks to the "actual concrete elements" of the plot, not generalized plot ideas.[142] The court agrees that a "walk of shame" is not itself protectable; Shame on You, in fact, does not argue to the contrary. See *Berkic,* 761 F.2d at 1293 ("General plot ideas are not protected by copyright law"). Instead, it cites a list of perceived similarities in the two plots. The Ninth Circuit is "particularly cautious [in finding substantial similarity] where[ a] list [of perceived similarities] emphasizes random similarities scattered throughout the works." *Litchfield v. Spielberg,* 736 F.2d 1352, 1356 (9th Cir.1984). Shame on You contends that both works feature a female lead character[143] living in a big city, who breaks up with her boyfriend, gets drunk, spends a "one-nighter" with a man she just met who works as a bus-boy/bartender, wakes up disoriented the next morning at his place, puts on the bright dress she was wearing the night before, and embarks on a walk of shame through the city to get to an important event. It asserts that in each work, the lead character makes it to her important event, but nonetheless reveals the embarrassing truth of her misadventures the night before, and ultimately finds meaningful romance with a man who helped her through her troubles.

As an initial matter, many of the purported similarities Shame on You identifies flow directly from the basic premise of a walk of shame. See *Funky Films,* 462 F.3d at 1081 ("[G]eneral plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind," quoting *Berkic,* 761 F.2d at 1293); *Cavalier,* 297 F.3d at 824 ("basic plot ideas, such as this one, are not protected by copyright law"); *Shaw,* 919 F.2d at 1356 ("Copyright law protects an author's expression; facts and ideas within a work are not protected"). A film whose central premise is a walk of shame must employ devices to extend the lead character's return to her abode; thus here, both Darci and Meghan lose their cellular telephones and wallets. Absent these plot devices, each character could simply have called a friend or paid for a taxi. Getting drunk, spending a "one-nighter" with someone you just met, waking up disoriented the next morning at the individual's house or apartment, and putting on the clothes worn the night before are also plot devices that are necessary to a walk of shame. Thus, these *scenes-à-faire* are not protectable. See *Williams v. Crichton,* 84 F.3d 581, 589 (2d Cir.1996) (holding that "electrified fences, automated tours, dino-

---

**142.** MTD at 5. See also MJOP at 17 (a walk of shame "is a common pop-culture reference and generic plot theme[, which] ... is unprotectable").

**143.** Shame on You makes much of the fact that both Darci and Meghan are "good girls." This contention is discussed in detail in the court's comparison of characters, *infra.*

saur nurseries, and uniformed workers" were "classic scenes-a-faire that flow[ed] from the uncopyrightable concept of a dinosaur zoo").

Shame on You also contends that in each work, the main character makes it to an important event but nonetheless reveals her misadventures the night before. It is true that both lead characters make it to an important event. The events, however, are entirely different. In *Darci's Walk of Shame*, the important event is a farewell brunch at the Four Seasons Maui following the wedding of Darci's sister. In *Walk of Shame*, the event is a morning news broadcast Meghan must anchor to secure her "dream job." Moreover, it is not the case that in both works, the lead character voluntarily reveals her misadventures the night before. When Meghan finally arrives at KZLA, she is asked to inform viewers of a breaking story about a person—the "Hooker Hoodlum," who, of course, is her. Meghan could have avoided revealing the truth about her walk of shame, but decided to reveal that she was the hooker hoodlum. She states:

> "Yes. I woke up in a strange bed and had to endure the longest, weirdest 'Walk of Shame,' but guess what? I am not a HOOKER. And I am not ashamed! I don't care what people think anymore. It's exhausting!" [144]

By contrast, although Darci elects to wear her pink bridesmaid dress covered in dirt and sand as a result of her walk of shame, Darci does not reveal the details of the walk of shame. Unlike Meghan, she is content to allow her love interest, Nathan, to tell those at the brunch that they had a romantic evening together the night before.[145] This is foiled when Justin—the college freshman with whom she actually

spent the night—enters and explains what actually happened, i.e., that Darci got drunk and went home with him.[146] Shame on You's assertion that both lead characters voluntarily reveal their walk of shame is thus incorrect.

Nonetheless, there are similarities between the plots. Both lead characters have recently separated from ex-boyfriends. In *Darci's Walk of Shame*, however, Darci catches Brian in the act of cheating and walks out on him. In *Walk of Shame*, by contrast, we learn that Kyle, Meghan's fiancé, has left her for another woman. Similarly, in both works, the lead character meets a man who helps her make it to her final destination. The type of help provided, however, differs significantly. In *Darci's Walk of Shame*, Nathan rescues Darci from what appears to be a life-threatening situation after Darci is bitten by a poisonous snake while walking on the side of the highway in Maui.[147] Nathan, who is not only a taxicab driver but also a volunteer fireman, quickly treats her, sucking the venom from Darci's toe. Nathan is also a helicopter pilot, and offers to fly her back to the hotel where she is staying. After a lengthy tour of Maui from the air Nathan reluctantly drops Darci at a ranch near her hotel because he has to save Darci's parents and other visitors from an active volcano, and Darci is embarrassed to see her parents.

In *Walk of Shame*, by contrast, Gordon, a bartender, appears early in the movie—Meghan goes to his downtown Los Angeles apartment after getting drunk at the nightclub where he works. Gordon does not interact with Meghan again until the end of the movie when he finds her at a tow lot trying to steal her car. He then attempts to drive her—with Denise and

---

144. WOS at 98.

145. DWOS at 94–97.

146. *Id.* at 97–99.

147. *Id.* at 57.

Rose—to KZLA; because of Carpocalyse, however, they run into bumper-to-bumper traffic. Chopper Steve comes to the rescue and gives them a ride to KZLA. Unlike the extended helicopter scene in *Darci's Walk of Shame*, none of the helicopter ride is depicted in *Walk of Shame*.

Thus, the plots share certain general similarities: in both works, the lead characters are helped to their final destination by "nice guy" male characters. In both, the lead character is flown to her final destination by helicopter, and both involve recent ex-boyfriends who appear. "Despite these similarities, the two narratives are strikingly different," and the court cannot conclude that the plots have protectable similarities. See *Benay v. Warner Bros. Entertainment, Inc.*, 607 F.3d 620, 625 (9th Cir.2010). *Benay* is particularly instructive. There, comparing the plot of a screenplay and film based on the journey of an American war veteran to Japan in the 1870's, the court explained:

> "In both the Screenplay and the Film, an American war veteran travels to Japan in the 1870s to train the Imperial Army in modern Western warfare in order to combat a samurai uprising. Not surprisingly, the stories share similar elements as a result of their shared premise. In both, the protagonist starts in America and travels to Japan where he meets the Emperor, who is struggling to modernize Japan. Both protagonists introduce modern warfare to the Imperial Army, using contemporary Western weaponry and tactics. Both works feature a Japanese foil in the form of the leader of the samurai rebellion. And in both works the protagonist suffers a personal crisis and is transformed as a result of his interaction with the samurai." *Id.* at 625.

Even with these notable similarities, the Ninth Circuit concluded that the works were not substantially similar because the "two narratives [were] strikingly different." *Id.*

> "Plaintiffs' protagonist, Gamble, emerge[d] from domestic security, to despair at the loss of his son, to revenge and triumph when he defeats his ruthless antagonist, Saigo. In contrast, the protagonist in [d]efendants' film move[d] from isolation and self-destructive behavior, to the discovery of traditional values and a way of life that he later comes to embrace. Thus, unlike Plaintiffs' Screenplay, which is largely a revenge story, Defendants' film is more a captivity narrative reminiscent in some respects [of] *Dances With Wolves*." *Id.* at 626.

In this case, although they share the same premise and a number of elements that follow naturally from that premise, the two works at issue tell fundamentally different stories. *Walk of Shame* is the story of a conservative news anchor whose goal in life is to achieve perfection. The narrative conveys the message that one must be content to be oneself, with attendant imperfections, instead of living one's life to satisfy or please others. In the first exchange between Meghan and her boss, Dan Karlin, he tells her that she should "be [her]self" when she interviews for the lead anchor job. Meghan responds, "I just want to be what *they* want." [148] By the end of the film, Meghan has come full circle and realizes that being what others want her to be is not how she wants to live her life. On live television, with studio executives who could offer her her "dream job," Meghan says:

> "I tried hard my entire life to be perfect. Perfect husband, perfect dog, perfect job. But now that I've been out in the *streets* ... I can tell you, the world isn't perfect. And neither am I.... *[W]hat-*

---

148. *Id.* at 2 (emphasis original).

*ever* I did, I did it because I was trying to convince a few people ... I am something I no longer am. I'm not safe or perfect. If I'm going to tell you the news, I should be telling you the real story, not reading a script. I'm not an anchor. Because anchors sit and rust.... I'm going to shine." [149]

Despite Shame on You's assertions to the contrary, the narrative of *Darci's Walk of Shame* does not convey the notion that one should ignore societal expectations and be happy with oneself. Although Shame on You contends that at the end of the film, Darci realizes she does not care what others think of her because she reveals her walk of shame at her sister's farewell brunch, this mischaracterizes the screenplay. As noted, Darci allows Nathan to tell those present that they spent a romantic evening together the night before.[150] It is only when Justin arrives, and explains what actually happened, i.e., that Darci got drunk and went home with him, that the truth is revealed.[151] Moreover, far from suggesting that Darci did not care what those at the brunch thought, the screenplay states that Darci "can't stand" the looks she is getting after Justin discloses the truth, and leaves the brunch looking "visibly upset." [152] As Garner and Broken Road contend, *Darci's Walk of Shame* is primarily a romantic comedy. Love and finding the "right guy" are the focal points of the narrative, as evidenced by the setting in idyllic Maui, the fact that Darci is attending her sister's wedding, and the fact that Nathan follows Darci to rainy Chicago because he wants to be with her. Indeed, the screenplay ends with the two embracing outside O'Hare International Airport in the pouring rain. Gordon and Meghan appear to be at the beginning of a relationship that could develop into a romance in *Walk of Shame*, but they are not described as being in love, and love is not even a sub-theme of the work. The most Meghan ever says about Gordon is that it "[t]urns out [she] like[s] him, and [she's] pretty sure he likes [her too]." [153]

The case is thus analogous to *Funky Films*, in which the works at issue told the story of a small funeral home operated by two brothers after the sudden death of their father. 462 F.3d at 1077. The Ninth Circuit observed that the works shared numerous similarities, in many ways more striking than the ones in this case. For example, in both works, the older brother moved home from a far away city, was creative, unlike his conservative younger brother, and initially had no interest in becoming involved in the family business. In both, the business was financially fragile, and a rival funeral home attempted to acquire the business but failed. Finally, in both, the younger brother changed his church affiliation in order to increase the client base. *Id.* at 1077–78. Closer examination of the works revealed, however, that one was essentially a murder mystery, while the other was a study of "the way the characters struggle with life in the wake of the cataclysmic death of [their] father." *Id.* at 1078 (emphasis omitted). The Ninth Circuit therefore held that the plots developed "quite differently," and rejected the plaintiffs' copyright claim. *Id.*

Here, as in *Funky Films*, because the plots of the works develop differently, and because many of the similarities are, in fact, unprotectable scènes-à-faire, there is no substantial similarity in plot that would warrant a finding of copyright infringement.

149. *Id.* at 98.

150. DWOS at 94–97.

151. *Id.* at 97–99.

152. *Id.* at 99.

153. WOS at 98.

## b. Themes

The themes of the works are likewise not substantially similar. Shame on You argues that both works have a "core theme of comedy, embarrassment, and irony following a grown woman's 'walk of shame' (mis)adventure that she is much too old for."[154] The mere fact that a theme is comedic or ironic is not protectable. See *Willis*, 2001 WL 1352916 at *2 ("The problem with Plaintiff's claim ... is that, to the extent that there are similarities, they are found either in stock characters, or themes that are common to the talent agency business, or to situation comedies in general or in trivial detail that are not essential to either series"); see also *Benjamin v. Walt Disney Co.*, No. CV 05–2280 GPS, 2007 WL 1655783, *5 (C.D.Cal. June 5, 2007) ("Plaintiffs also contend that the following themes are also expressed in both works: (1) 'people do not choose love, love chooses you;' (2) 'in relationships you can either follow your head or follow your heart;' and (3) 'sometimes what you are looking for ... is right where you left it.' While these themes are evident in both *Sweet Home* and *Rescue Me*, ... stock themes 'cannot raise a triable issue of fact on [a] plaintiff's copyright claim.' These themes are very common in other romantic comedies, and therefore cannot raise a triable issue of fact").

Shame on You appears to contend that the protectable similarity between the screenplays in this case is the fact that Darci and Meghan are both "much too old" to make a walk of shame. It is unclear why Shame on You maintains that a thirty-something woman is "much too old" for a walk of shame. The assertion, moreover, is arguably belied by the text of the *Darci's Walk of Shame* screenplay, which, in the opening scene, directs the camera to focus on various young and "NOT SO YOUNG WOMEN" making a walk of shame.[155] More fundamentally, *Walk of Shame* does not communicate such a theme. The work does not suggest that Meghan is too old to make a walk of shame; indeed, it appears that her friends—who are roughly her age—make walks of shame as well. For example, Denise goes home with someone she had just met after going to the same nightclub at which Meghan meets Gordon, and he appears in the film to be older than she is.[156]

As Garner and Broken Road argue, the core theme of *Walk of Shame* is, as noted, being content with oneself's and one's imperfections and not living one's life to please others.[157] By contrast, *Darci's Walk of Shame* is primarily a romantic comedy; Darci does not undergo a self-transformation similar to Meghan's.[158] Although

---

**154.** MTD Opposition at 14.

**155.** DWOS at 2 (capitalization original).

**156.** WOS at 48.

**157.** MTD at 7.

**158.** As Garner and Broken Road argue (MTD at 6–7), even if *Darci's Walk of Shame* employed a similar theme of learning to be content with who one is, courts have held that similar themes—e.g., self-reliance—are not protectable as a matter of law. See *Campbell v. Walt Disney Co.*, 718 F.Supp.2d 1108, 1113 (N.D.Cal.2010) (dismissing a complaint because "themes of self-reliance and the impor-

tance of friendship and teamwork" are not protectable); see *Gadh v. Spiegel*, No. CV 14–855 JFW (PJWx), 2014 WL 1778950, *5 (C.D.Cal. Apr. 2, 2014) (finding that the "abstract" theme of "an in-depth look at the human psyche through the interaction of the characters' and a special 'phone'" was not protectable); see also *Olson v. National Broadcasting Co., Inc.*, 855 F.2d 1446, 1450 (9th Cir.1988) (the idea of a group action-adventure series portraying Vietnam veterans in a positive light as they perform good deeds is not protectable). Because *Darci's Walk of Shame* does not employ this theme, however, the court need not decide whether, on the facts of this case, such a theme is unprotectable as a matter of law.

Shame on You contends Darci realizes she does not care what others think of her because she reveals her walk of shame at her sister's brunch, in reality, Darci allows Nathan to tell a different story,[159] cannot tolerate the looks she receives when Justin reveals the truth, and leaves looking "visibly upset." [160] The story does not end with Darci accepting or embracing her imperfections; rather, it ends as Darci and Nathan kiss at the Chicago airport to which he has followed her—an undoubtedly tender, romantic conclusion.

In sum, the court concludes that the themes of the two works are not substantially similar.

#### c. Dialogue

 To show substantial similarity based on dialogue, a plaintiff must establish "extended similarity of dialogue." *Olson*, 855 F.2d at 1450. Ordinary words and phrases are not entitled to copyright protection, nor are "phrases or expressions conveying an idea typically expressed in a limited number of stereotyped fashions." *Narell v. Freeman*, 872 F.2d 907, 911–12 (9th Cir.1989). Garner and Broken Road argue that a comparison of the two works indicates there is virtually no overlap in dialogue. The court agrees. The court's review indicates that the overlap in dialogue is isolated and involves common words or phrases. Meghan asserts she is a "good girl" in her interview for the lead anchor position,[161] while Darci's mother tells her she is a "good girl" because she has never made a walk of shame.[162] In its opposition, Shame on You notes that the words "whore" and "prostitute" are used throughout each work.[163] The court notes that there are also references to relationships and to "sexy" or "slutty" attire throughout the works.[164] Shame on You alleges in the first amended complaint that both works feature parking signs that use similar words to indicate that a particular area is a towaway zone.[165] These comparisons, however, do not support a finding that the dialogue of the works is substantially similar because they involve "short, stock phrases which are not protectable." *Merrill v. Paramount Pictures Crop.*, No. CV 05 1150 SVW (MANx), 2005 WL 3955653, *13 (C.D.Cal. Dec. 19, 2005) (finding no similarity in dialogue where "in each fight scene, the female protagonist tells an aggressive male to 'stop it' [and] the aggressive male ... says to the female lead: 'let's go,'" citing *Southco, Inc. v. Kanebridge Corp.*, 390 F.3d 276, 285–287 (3d Cir.2004) (recognizing the longstanding principle of copyright law that words and short phrases are not copyrightable)); *Bernal v. Paradigm Talent & Literary Agency*, 788 F.Supp.2d 1043, 1072 (C.D.Cal.2010) (agreeing that certain "lines contain[ed] similar words," such as "I miss you," "He's so funny," "Stay away from this neighborhood," and "Mmm. That's it," but finding they were "ordinary, common expressions that [were] not copyrightable"); see also *Ets–Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1081 (9th Cir.2000) ("Brand names, trade names, slogans, and other short phrases or expressions cannot be copyrighted, even if they are distinctively arranged or printed").

---

159. DWOS at 94–97.

160. *Id.* at 99.

161. WOS Movie at 1:03.

162. DWOS at 27.

163. MTD Opposition at 16.

164. See, e.g., DWOS at 14 ("Ohh. Sexy"); WOS at 12 ("You're wearing something slutty").

165. FAC, ¶ 29(22) (comparing "NO PARKING ... CARS WILL BE TOWED" in *Darci's Walk of Shame* to "NO PARK—TOWAWAY ZONE" in *Walk of Shame*).

Shame on You cites paragraph 29 of the first amended complaint, which it asserts compares the dialogue used in the works. For the most part, paragraph 29 alleges similarity of dialogue in conclusory fashion without quoting the language at issue. Cf. *Wild v. NBC Universal, Inc.*, 788 F.Supp.2d 1083, 1106 (C.D.Cal.2011) ("Plaintiff avoids dealing with the lack of any similarity in dialog[ue] by asserting, in cursory fashion, that in the first two episodes 'even the dialogue is similar' to that found in *Carnival of Souls*. This assertion is cursory because even a casual comparison of the two works demonstrates its absurdity"), aff'd, 513 Fed.Appx. 640 (9th Cir. Feb. 28, 2013) (Unpub.Disp.). The court has conducted an independent review of the works in their entirety. Other than the similarities noted above, the only other comparisons of *dialogue*—as opposed to plot summary—found in paragraph 29 are not at all similar. Shame on You compares Lori's statement to Darci that she should "be the flame, not the moth," to Rose's demand that Meghan not "block the cock." The court cannot discern how this dialogue is similar in any respect. The first reference appears to be advice that Darci should be alluring so that she can attract a man rather than being someone who is attracted to men who will ultimately disappoint her. The second reference is essentially a demand that Meghan not interfere with Rose's ability to score sexually.

Shame on You also asserts that each lead's ex-boyfriend apologizes for the break-up. This mischaracterizes the dialogue, however. In *Darci's Walk of Shame*, Brian sincerely apologizes to Darci. He says that he is sorry, that she deserved "a great guy," that he was not that person, and that he had been waiting until the day she realized that and broke up with him.[166] By contrast, in *Walk of Shame*, Meghan calls Kyle while at a "ghetto crackhouse" in downtown Los Angeles. When Kyle answers, perturbed, he says quietly to her: "Meghan? What are you ... You were never going to call me.... I thought we weren't going to talk." Meghan says she "had to call," and he cuts her off, saying: "Look. Breaking up was the hardest thing I ever did...." He then tells her to "hold on," slips out of bed, and admits he is sleeping with another woman.[167] The dialogue in these scenes is not substantially similar. Brian's apology is sincere and is intended to make Darci feel better and understand her worth. Kyle does not apologize; he reminds Meghan that she agreed never to call him again, and then makes her feel worse by telling her he is sleeping with another woman. That Kyle's statement was not sincere is reinforced at the end of *Walk of Shame*; Kyle watches on television as Meghan reveals that she is imperfect and no longer cares about pleasing others. His new girlfriend says: "You were engaged to her? Seriously?" Kyle responds: "So glad I dumped her." [168] The dialogue between the lead characters and their ex-boyfriends in the two works is not similar in language or meaning.

Finally, Shame on You contends that the dialogue that takes place at the towing company in each work is substantially similar. In both works, the lead character states that she does not own the car that has been towed, but has the keys. The lead actresses are without their purses, albeit for different reasons (Darci's purse is at the hotel, while Meghan believes hers is in her car although it was actually stolen). Garner and Broken Road do not

---

**166.** DWOS at 79–80.

**167.** WOS at 36.

**168.** *Id.* at 99.

address the similarity in this dialogue, and the court finds that it has articulable similarities. Aside from this limited exchange, however, the remainder of the dialogue lacks any articulable similarities.

#### d. Mood

 Garner and Broken Road also argue that the mood of the screenplays is not substantially similar. A general mood that flows "naturally from unprotectable basic plot premises" is not entitled to protection. *Rice*, 330 F.3d at 1177 (concluding that the mood of secrecy and mystery in works about the mystery of magic was "generic, constitute[d] *scenes a faire*, and merge[d] with the idea of revealing magic tricks"). Thus, Shame on You cannot demonstrate there is substantial similarity in mood by arguing that both works are light-hearted comedies that involve a walk of shame. See *Olson*, 855 F.2d at 1451 ("Both shows may be broadly described as comic, and they therefore have similar moods. Both works are quickly paced. However, these similarities are common to the genre of action-adventure television series and movies and therefore do not demonstrate substantial similarity"); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir.1986) (denying protection to " 'stock' themes commonly linked to a particular genre"); *Berkic*, 761 F.2d at 1293–94 (denying protection to "familiar scenes and themes [which] are among the very staples of modern American literature and film").

Setting aside this abstract and unprotectable similarity, the mood of the two works is quite different. *Darci's Walk of Shame* is a romantic comedy in which Darci tramples a golf course while driving a stolen golf cart, is bit by a poisonous snake, and is rescued in a helicopter by the man of her dreams while at an upscale destination wedding at the Four Seasons Maui. Despite the fact that there is a love interest, *Walk of Shame* is not primarily a romantic comedy. It has a decidedly urban tone, and tells the story of an uptight character who is forced to examine the things that are important to her in life while being exposed to some of the less savory aspects of Los Angeles, e.g., "ghetto crack houses." [169] The only similarities in mood are scènes-à-faire that are not entitled to protection.

#### e. Setting

 Garner and Broken Road also argue that the setting of the two works is entirely different. [170] The court agrees. *Walk of Shame* is set in Los Angeles, California, and the city features prominently in the screenplay and film. The story begins in the KZLA news room in Hollywood, and moves to suburban Brentwood, where Meghan's apartment is located. Friends convince her to go to a nightclub in downtown Los Angeles. In the movie, Los Angeles' financial district, and the train yards and bridges behind Union Station are showcased. Meghan also visits a "ghetto crackhouse" somewhere downtown. She passes the Wilshire District, traveling from Western Avenue to MacArthur Park, where she boards a Los Angeles Metro bus and travels to a Jewish synagogue in midtown. In one of the final scenes, Meghan runs across Interstate 10 just ahead of oncoming traffic following the end of "Carpocalypse"—a reference to "Carmaggeddon" in 2012, which closed the 405 Freeway for an entire weekend to facilitate road expansion and repair. [171]

*Darci's Walk of Shame* is set primarily on the island of Maui in Hawaii, although

---

169. Shame on You contends that a male lead helps both female lead characters get to their final destinations. This is a description of plot, not mood, and is discussed above.

170. MTD at 9.

171. WOS at 7.

it begins and ends in Chicago, Illinois. Maui is depicted as a paradise for married couples or people in love; it is certainly not an urban city like Los Angeles. The majority of travelers on Darci's plane to Maui are honeymooners. When she arrives at the hotel in Maui, the honeymoon theme continues; she is informed that there is a complimentary bottle of champagne and strawberries with whipped cream in her room, together with massage oils and "even a special lovers' massage table for two."[172] Other than the opening and closing scenes in Chicago, Darci's Walk of Shame takes place entirely on Maui; it involves beach scenes, active volcanoes, a horseback ride to the coast, and a helicopter flight in which much of the island is showcased. It is evident that the settings of the two works are substantially different, not similar.

Shame on You counters that each work takes place in a city, and employs similar settings. The mere fact that some portion of both works occurs in a city is "generic and inconsequential, [and thus] fail[s] to meet substantial similarity." *Rice*, 330 F.3d at 1177. Shame on You asserts, more specifically, that both works include a "gentleman's room where [a] one-night-stand takes place, a tow yard, a place of worship, a spa, city streets . . ., an outdoor chase on wheels, and a helicopter ride."[173] The use of a gentleman's bedroom is a scène-à-faire, since going home with someone met at a bar, party or club is an essential element of a walk of shame. See *Cavalier*, 297 F.3d at 824 ("[T]his setting naturally and necessarily flows from the basic plot premise . . . [and] therefore . . . constitutes scenes-a-faire and cannot support a finding of substantial similarity"); see also *Benay*, 607 F.3d at 627–28 ("Given that both works involve an American war

veteran who travels to Japan to help the Emperor fight a samurai rebellion, it is not surprising that they share certain settings: a scene of the protagonist sailing into Japan, scenes in the Imperial Palace, scenes on the Imperial Army's training grounds, and battle scenes in various places in Japan. These are all scènes-à-faire that flow naturally from the works' shared unprotected premise and are therefore disregarded for purposes of the extrinsic test"). Moreover, despite Shame on You's assertion, there are essentially no scenes that take place on city streets in *Darci's Walk of Shame*; in any event, the use of city streets is generic and flows from the unprotectable concept of setting a work in a city.

There is some degree of similarity between the settings of the works to the extent each lead character finds herself at a tow yard. Garner and Broken Road argue that cherry picking this type of example obscures the fact that Walk of Shame is set in Los Angeles while Darci's Walk of Shame is set in Hawaii (except for brief Chicago scenes).[174] Moreover, they assert that to the extent such similarities are considered, they are simply scènes-à-faire.[175] They contend it was necessary to drive from Brentwood to downtown Los Angeles to go to a nightclub; for Meghan to make a *walk* of shame, her car had to be towed. Had Meghan simply been able to drive her car to KZLA, there would have been no walk of shame, and no movie. For this reason, defendants contend, the tow yard setting "naturally and necessarily flows from the basic plot premise . . . [and] therefore . . . constitutes [a] scene[ ]-a-faire [that] cannot support a finding of substantial similarity." See *Cavalier*, 297 F.3d at 824. Although it is reasonably

172. DWOS at 14.

173. MTD Opposition at 15.

174. MTD Reply at 6.

175. *Id.*

foreseeable that if one's car is towed, one might have to walk some distance, one could also call a cab, call a car service like Uber or Lyft, or call a friend. Similarly, there are numerous other ways that someone like Meghan could have been stranded—she might have driven to the nightclub in Rose's or Denise's car and been without transportation after she left with Gordon; her car could have been stolen; it could have been damaged in a collision with another car; or it could have had mechanical problems. Thus, there is an articulable similarity in setting insofar as the car the lead character is using is towed in both movies, and she ends up at a tow lot.

Shame on You counters that both works also involve chase scenes and a helicopter ride. A close inspection of the screenplays demonstrates that the chase scenes are not similar, however. In *Darci's Walk of Shame*, Darci steals a golf cart from a group of Japanese golfers and is chased around a resort golf course by angry golfers.[176] There is no parallel in *Walk of Shame*. Although in one of the final scenes, Meghan runs on foot from police officers trying to apprehend her, the two scenes have no parallels beyond the fact that they involve the abstract, generic concept of an "outdoor chase on wheels"; such a concept is not entitled to protection. See *Identity Arts v. Best Buy Enter. Servs. Inc.*, No. C 05 4656 PJH, 2007 WL 1149155, *16 (N.D.Cal. Apr. 18, 2007) ("To the extent that similarities exist, they are too generic to qualify for protection, or otherwise unprotectable (e.g., scenes a faire)").

Shame on You is correct that both works involve helicopter rides, however. In *Darci's Walk of Shame*, Nathan rescues Darci and takes her on a helicopter tour of Maui before dropping her off at a ranch near her hotel. The helicopter involved in *Walk of Shame* is the KZLA traffic helicopter operated by "Chopper Steve." Chopper Steve reports traffic conditions in every scene in which he appears. He adds comedic relief, as he makes bad jokes, apparently because he stopped taking his medication. Near the end of the screenplay, Meghan and Gordon ride in Chopper Steve's helicopter to KZLA, although the ride itself is not depicted. Thus, while it is true the lead character takes a helicopter ride in both works, the helicopter is not a setting in *Walk of Shame* as the ride is not shown, and the settings are not similar in this respect. Nonetheless, just as having one's car towed is not necessary to a walk of shame, having a helicopter transport the lead character to her final destination is not a necessary scène-à-faire. Accordingly, there is an articulable similarity between the settings of the two works to the extent both include a helicopter ride that takes the lead character to her final destination.

Finally, although the court agrees that a portion of each work is set in a place of worship and a spa, the scenes are not substantially similar. *Darci's Walk of Shame* involves a church, while *Walk of Shame* involves a synagogue in midtown Los Angeles. There is nothing similar about the settings (or what happens at the settings) other than the general fact that they are houses of worship. Similarly, the spa in *Darci's Walk of Shame* is at the Four Seasons hotel; Darci and her family and friends visit it *before* her walk of shame. The spa in *Walk of Shame* is in Koreatown; Meghan visits it while frantically avoiding the police and trying to get to KZLA. Nothing about the settings is substantially similar so as to warrant a finding of copyright infringement.

In sum, both works involve tow lot scenes and a helicopter ride, but none of

---

**176.** DWOS at 41–47.

the remaining the protectable settings in the works is substantially similar. Moreover, as noted, "[s]ome of the settings are strikingly dissimilar," which cuts against a finding of substantial similarity. *Benay*, 607 F.3d at 628 (noting the striking dissimilarity in many aspects of the settings, and concluding there was no substantial similarity).

### f. Pace

■ Garner and Broken Road maintain it is difficult to compare the pacing of a produced film to a "flat" screenplay. Nonetheless, it is apparent that *Darci's Walk of Shame* contains more characters, scenes, and dialogue than does *Walk of Shame*. As a result, the pacing in *Darci's Walk of Shame* must of necessity be faster than the pacing of *Walk of Shame*. Shame on You disputes this. It contends that the pace of each work is "extremely similar," because the "fact that each takes place over a very short period of time (basically a day) is not standard."[177]

■ "The time period within which the movie is set is a factor [in] determining the pace of the movie." *Campbell*, 718 F.Supp.2d at 1115 (citing *Capcom Co., Ltd. v. MKR Group, Inc.*, No. 08–0904–RS, 2008 WL 4661479, *10 (N.D.Cal. Oct. 20, 2008) (finding no substantial similarity in the pace of two works due partly to the fact that one story was completed within three days while the other took place over many months)). Nonetheless, the court cannot find the pace of the two works substantially similar. *Darci's Walk of Shame* takes place over the course of three days: Darci arrives on Maui, goes to the rehearsal dinner, and attends her sister's wedding the following day; at the reception, she gets drunk, which results in her walk of shame over the course of the following day. *Walk of Shame* takes place over roughly a twenty-four hour period; it

involves a single night only. An examination of the screenplays, moreover, confirms that the pace is markedly different. *Darci's Walk of Shame* begins in the morning in Chicago, where Brian and Darci break up. Darci then flies to Maui, and spends time there with her family before the rehearsal dinner. On what appears to be the following day, the bridal party visits a spa, and the wedding and wedding reception take place. Darci's walk of shame consumes much of the day after the wedding, followed by her arrival at the farewell brunch.[178] During her last day on Maui, Darci goes to church, tries to get Justin's car out of the impound lot, is bitten by a snake, is saved by Nathan, goes on a long helicopter ride, runs into Brian and Virginia while trying to avoid her parents, and is transported in a canoe by native Hawaiians; all this occurs before the brunch. As can be seen, *Darci's Walk of Shame* is fast-paced.

■ The pace of *Walk of Shame* is significantly less fast than *Darci's Walk of Shame*. The story unfolds over roughly twenty-four hours; there is no flight to Hawaii or change of time zones, and significantly fewer events are packed into a short period. See *Rice v. Fox Broadcasting Co.*, 148 F.Supp.2d 1029, 1059 (C.D.Cal.2001) ("For similar reasons, the pace of the two presentations is also quite different. This is illustrated by the fact that, in TV Special 1, the Masked Magician performs *and reveals* eleven complicated tricks in roughly the same amount of time that it takes the Mystery Magician to perform twelve tricks (many of which are less complicated) and only reveal *six*. The Television Specials are *much* more fast-moving"), aff'd in relevant part, 330 F.3d 1170 (9th Cir.2003). Even assuming the pace at which the plots unfold is similar,

---

**177.** MTD Opposition at 17.

**178.** DWOS at 88.

"[t]he bare concept of a pace that is 'fast but not frenetic' is unprotectable." *Briggs,* 70 F.Supp.3d at 1177, 2014 WL 4961396, at \*19; see *Olson,* 855 F.2d at 1451 ("Both works are quickly paced. However, these similarities are common to the genre of action-adventure television series and movies and therefore do not demonstrate substantial similarity").

Finally, as Garner and Broken Road argue, even if it is assumed that both works feature the brisk pace of many modern comedies, similarities of pace that are common to a genre are insufficient to satisfy the extrinsic test.[179] See *Olson,* 855 F.2d at 1451 ("Both works are quickly paced. However, these similarities are common to the genre of action-adventure television series and movies and therefore do not demonstrate substantial similarity").

### g. Characters

■■■ Garner and Broken Road next maintain that there are no meaningful similarities between the characters. They assert that the main characters are completely distinguishable, beyond abstract similarities that are not protectable, and that the remaining characters are not similar in any meaningful respect. The court addresses each category of characters in turn.

#### (1) Meghan and Darci

First, Garner and Broken Road assert that the lead characters are markedly different. Meghan Miles is a career woman. In the opening scene, the audience learns that she wants the network anchor job for which she is interviewing because "[b]eing a network anchor is [her] dream."[180] Her career focus becomes even clearer when her friends, Rose and Denise, come to her apartment and ask where her fiancé Kyle is. Meghan explains that he went to the supermarket; Rose quickly observes, however, that most of her furniture and things are gone. Meghan first states that he brought his belongings with him to the supermarket; she then "tears up," and admits that Kyle left her because he "didn't know who [she] was anymore."[181] She says she did not tell her friends because she "thought getting the job would make it all better." She then "breaks into sobs," and states that she did not get the job after all.[182] The reader is left with the impression that Meghan finds breaking up with her fiancé worthy of a tear, but that not getting the job she wanted warrants extended sobbing. The entire premise of the movie, moreover,—i.e., the walk of shame—is based on Meghan's effort to get to the KZLA studio before the morning news broadcast so that she has a second chance at the anchor job she has always wanted. Meghan is also "very buttoned down[ and] conservative."[183] After learning that Meghan's fiancé has left her, Rose said that she needed to "go[ ] to the club [and] ... meet some nice, young, new guy and take out all your problems on his penis."[184] Meghan responds that she is "a relationship kind of girl," and would rather stay home and watch American Idol on television. She is convinced to go to a club, but says that she will wear sweatpants. When her friends tell her she has to wear "something slutty," Meghan says she does not "have [anything] slutty like Denise."[185] Her friends persuade her to wear Denise's "short yellow dress," which

179. MTD at 10.

180. WOS at 1–2.

181. *Id.* at 11.

182. *Id.*

183. *Id.* at 1.

184. *Id.* at 12.

185. *Id.*

makes her feel "like a prostitute."[186] At the club, Meghan is hesitant to drink anything; her friends order three shots; she takes one of them, and winces after taking a small sip. Her friends urge her to drink the shot all at once; she takes a deep breath and finishes not only her shot, but—believing she was expected to—the other two as well.[187] This makes apparent the fact that Meghan is not a heavy drinker and is a conservative "good girl" primarily interested in her career. It also creates a situation warranting a walk of shame without the intentionally heavy drinking that ordinarily leads to such an event.

Darci is a markedly different character. *Darci's Walk of Shame* does not mention Darci's occupation. Although Darci's mother calls her a "good girl" at one point, Darci is neither conservative nor uptight.[188] While flying to Maui after finding her ex-boyfriend Brian having sex with their travel agent, Darci chats with an "uncomfortable" honeymoon couple. She shows them a picture of "Chris," and explains he was her first sexual experience; when the female of the couple says that he "seems nice," Darci retorts, "Please. I've had pees take longer."[189] On the same flight, Darci has an even more inappropriate conversation with a four-year-old girl in line for the bathroom involving sex on a plane with two different ex-boyfriends.[190] The uptight and conservative Meghan does not engage in similarly crass or inappropriate conversations in *Walk of Shame,* nor does the screenplay suggest in any

manner that Meghan would be inclined to behave in such a manner.

Unlike Meghan, moreover, who says she would rather stay home than go to a club, and who does not know how to drink shots, Darci starts drinking as soon as she boards the plane to Maui. She "chugs" a glass of champagne and immediately asks for another.[191] After inappropriate conversations with the honeymoon couple and the four-year-old, the screenplay cuts to Darci "drunk" and waiting in line for the lavatory.[192] Once she gets inside, the screenplay states that the audience should hear sounds of vomiting coming from the toilet.[193] In addition, the precursor to Darci's walk of shame is not as innocent as Meghan's. Darci's walk of shame begins the night of her sister's wedding reception. At the reception, Darci is described as drinking "one of those ridiculous giant pineapple drink things." When she sees Justin, she "downs" the entire drink and wakes up the next morning at his hotel room.[194] In sum, the fact that Darci's vocation is never mentioned, that she is crass and inappropriate, and that she seems unphased by excessive drinking makes her a different character than Meghan, who is uptight and conservative, and whose career obsession forms an integral part of *Walk of Shame.*

Shame on You counters that Meghan and Darci are "strikingly similar." It maintains that both are "pretty blonde but prudent wom[en] (. . .'good girls') in [their] thirties who [] wear[] inappropriate

186. *Id.* at 12–13.

187. *Id.* at 14.

188. DWOS at 26.

189. *Id.* at 5.

190. *Id.* at 5–6 ("Darci: And then there was this jerk, Steve. On a flight to Aruba he wanted [] me to join the mile high club.

Little Girl: I'm gonna join the brownies! Darci: Yeah. Justin wanted me to join that club too. Ironically—on the same flight").

191. *Id.* at 5.

192. *Id.* at 5.

193. *Id.*

194. *Id.* at 29–30.

brightly-colored dress[es]" throughout most of the work.[195] These character traits are too abstract to warrant copyright protection. "In determining whether characters are similar, a court looks at the totality of [the characters'] attributes and traits as well as the extent to which the defendants' characters capture the total concept and feel of figures in [the plaintiff's work]." *Hogan v. DC Comics,* 48 F.Supp.2d 298, 309–10 (S.D.N.Y.1999) (quoting *Walker,* 784 F.2d at 50 (in turn quoting *Warner Bros. v. American Broadcasting Cos.,* 720 F.2d 231, 241 (2d Cir.1983) (internal quotation marks omitted)). A "stock character or basic character type . . . is not entitled to copyright protection." *Hogan,* 48 F.Supp.2d at 310 (citing *Robinson v. Viacom Int'l, Inc.,* No. 93 CIV. 2539(RPP), 1995 WL 417076, *9 (S.D.N.Y. July 13, 1995); *Sinicola v. Warner Bros.,* 948 F.Supp. 1176, 1185 (E.D.N.Y.1996)). This is because "only distinctive characters are protectible, not characters that merely embody unprotected ideas." *Benay,* 607 F.3d at 626. Accordingly, "[n]o character infringement claim can succeed unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines." *Smith v. Weinstein,* 578 F.Supp. 1297, 1303, aff'd, 738 F.2d 419 (2d Cir.1984); see also *Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir.1930) ("the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly").

The concept of an attractive, blonde "good girl" is in the public domain and cannot be copyrighted. Even if the concept could theoretically be copyrighted, there is nothing distinctive about the way Darci is described in *Darci's Walk of Shame.* She is "32, mostly natural blonde and pretty." [196] Notably, the *Walk of Shame* screenplay *does not* describe Meghan as blonde, in her thirties, or pretty. The screenplay, in fact, does not describe the attributes of the character at all. Banks, who played Meghan in the motion picture, is in her thirties, blonde, and pretty. Nonetheless, a pretty blonde in her thirties is not a character that can be copyrighted. See *Gadh,* 2014 WL 1778950, at *5 ("The lead character in each work is a male who uses a mobile device that embodies a technologically-advanced electronic personal assistant. That abstract description is the full extent of any similarity in characters in the two works. In addition, even if the description of the characters was similar, such a description is far from the level of specificity and distinctiveness required for characters to be protected by copyright"). A 32–year-old female who is pretty and likeable is a stock character that lacks the distinctiveness required to invoke copyright protection. See *Benjamin,* 2007 WL 1655783, at *6 ("Melanie is the main character in *Sweet Home* and Maddie is the main character in *Rescue Me.* While Plaintiff contends both are attractive, likable, 30–year-old females that have escaped their humble past to pursue their dreams of working and living in the big city, these similarities are immaterial because they describe the female lead in almost every romantic comedy. Such stock characters are not protected by copyright law"); *Dunn v. Brown,* No. CIV.A. 10 11383 FDS, 2011 WL 4499007, *4 (D.Mass. Aug. 16, 2011) ("Plaintiff proffers as evidence only that Langdon has the physical descriptions of Hathaway because both characters wear jeans and are attractive, with blue eyes and nice smiles. These type of generic physical descriptions, however, do not have copyright protections"); *Alexander v.*

---

**195.** MTD Opposition at 15–16.

**196.** DWOS at 1.

*Murdoch,* No. CV 10–5613 PAC JCF, 2011 WL 2802899, *10 (S.D.N.Y. May 27, 2011) ("The plaintiff also claims that Rosa and Gloria are substantially similar because each is 'a stunningly beautiful, fiery, temperamental, Latina mother, with a thick accent, who's in love with her Caucasian [ex-husband/husband] and always makes him do the right thing, especially where her son is concerned.' The flaw in this comparison is that Rosa is a stock character and therefore not copyrightable"); *id.* ("attraction to blonde women cannot be said to be a rare or unique character trait; it is a basic character type and is not copyrightable"); *Feldman v. Twentieth Century Fox Film Corp.,* 723 F.Supp.2d 357, 367 (D.Mass.2010) ("Similarly, copyright protection does not extend to stock characters, such as a blond, blue-eyed hero or doctors in 'hot and cold' romances"); *Willis v. Home Box Office,* No. 00 CIV. 2500(JSM), 2001 WL 1352916, *3 (S.D.N.Y. Nov. 2, 2001) ("Arliss Michaels and Tym Barker are not the same character; they are both stereotypes of the amoral talent agent"); see also *Gaiman v. McFarlane,* 360 F.3d 644, 660 (7th Cir.2004) ("If a drunken old bum were a copyrightable character, so would be a drunken suburban housewife, a gesticulating Frenchman, a fire-breathing dragon, a talking cat, a Prussian officer who wears a monocle and clicks his heels, a masked magician, and, in Learned Hand's memorable paraphrase of *Twelfth Night,* 'a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress.' It would be difficult to write successful works of fiction without negotiating for dozens or hundreds of copyright licenses, even though such stereotyped characters are the products not of the creative imagination but of simple observation of the human comedy"); *Walker,* 784 F.2d at 50 (no copyright violation where both works "feature as central characters third- or fourth-generation Irish policemen who live in Queens and frequently drink; both show disgruntled, demoralized police officers and unsuccessful foot chases of fleeing criminals").

### (2) Gordon and Nathan

*Shame on You* also contends that Gordon from *Walk of Shame* and Nathan from *Darci's Walk of Shame* are substantially similar characters. It offers little argument supporting this assertion, however, stating merely that the two works feature "a male lead who is a nice guy with a number of occupations."[197] Gordon is a bartender and an amateur writer.[198] Nathan, on the other hand, is a jack of all trades; he is a cab driver and a volunteer fire fighter, and also flies an emergency helicopter. Although the men have multiple occupations, their work is dissimilar. The concept of a male character who works two or more jobs is not protectable. Additionally, the concept of a "starving artist" like Gordon who writes during the day and works another job at night to make ends meet is a well-known stock character that has passed into the public domain and cannot be copyrighted. "In sum, any similarity between the two characters 'exists only at a level of abstractions too basic to permit any inference that defendant[s] wrongfully appropriated any "expression" of plaintiff's ideas.'" *Arden v. Columbia Pictures Indus., Inc.,* 908 F.Supp. 1248, 1261 (S.D.N.Y.1995) (quoting *Kretschmer v. Warner Bros.,* No. 93 CIV. 1730(CSH), 1994 WL 259814, *11

---

**197.** MTD Opposition at 16. Shame on You also asserts that both male leads "help[ ] the female lead character reach her destination and ultimately find (it is suggested at least) lasting romance with him." (*Id.*) This is not a character trait, but rather an element of the plot, which is discussed above.

**198.** WOS at 20.

(S.D.N.Y. June 8, 1994) (in turn quoting *Zambito v. Paramount Pictures Corp.,* 613 F.Supp. 1107, 1112 (E.D.N.Y.1985)).

As the court has noted with respect to Darci and Meghan, the mere fact that the male leads are "nice guys" is not a protectable character trait. As Garner and Broken Road argue, Shame on You attempts to manufacture similarity by pointing to general character types that are not protected by copyright. The male lead in almost any light-hearted comedy is likeable. In such works, "good guys" with whom the female lead falls in love are stock characters. See *Rice,* 330 F.3d at 1176 ("[W]hile there may exist similarities between the magician 'characters,' any shared attributes of appearance and mysterious demeanor are generic and common"); *Campbell,* 718 F.Supp.2d at 1115 ("Thus, the characters generically labeled in the Complaint only as a 'cocky kid' and an 'older mentor' are not protected by copyright law. Moreover, the Court does not find anything outside of the two characters' generic cocky attitude to be similar"); *Benjamin,* 2007 WL 1655783, at *6 ("While Plaintiff contends both are attractive, likable, 30–year–old females that have escaped their humble past to pursue their dreams of working and living in the big city, these similarities are immaterial because they describe the female lead in almost every romantic comedy. Such stock characters are not protected by copyright law").

### (3) Comical Taxi Driver

Shame on You asserts that "a comical character taxi driver [ ]keeps showing up" in both screenplays. In *Darci's Walk of Shame,* Nathan—the lead male character—is the taxi driver who "keeps showing up." In *Walk of Shame,* Meghan takes a taxi to get her car, which has been towed from Gordon's apartment. When she tells the cab driver that her purse is in her car and that she has no money, he pulls out a gun and says she can either give him a lap dance or go to jail. Later in the screenplay and film, she runs into the cab driver again, and he threatens to kill her. Nathan—the love interest who saves Darci's life—is in no way similar to the "comical" taxi driver in *Walk of Shame.* That characters in both works drive a taxi is unremarkable.

### (4) Ex–Boyfriends

Shame on You cites the fact that both works involve ex-boyfriends who break up with the female lead early in the film, prompted, as the audience discovers, by involvement with another woman. In *Darci's Walk of Shame,* Darci catches Brian cheating on her in the opening scene; the other woman is the couple's travel agent.[199] Brian and Kyle, however, are markedly different characters that play different roles in the story. Brian comes to Hawaii, albeit with the travel agent Virginia, runs into Darci, and tells her she is very special and deserves someone better than him. Kyle is arrogant and obviously cares little about Meghan. Unlike Brian, who praises Darci, Kyle refuses to help Meghan—his ex-fiancé—when she calls him from a crackhouse, and, after watching her reveal her walk of shame on television, expresses satisfaction that he "dumped" her. Thus, other than the fact that they are ex-boyfriends—which is a generalized concept—there are no articulable similarities between the characters.

### (5) A Loud–Mouthed Swearing Female Best Friend in a Prominent Supporting Role

Shame on You also asserts that both screenplays feature a loud-mouthed female best friend who swears as a prominent supporting character. It does not identify

---

199. DWOS at 2–3.

who these characters are, however, and there is no explicit mention of such a character in *Darci's Walk of Shame*. One character—Lori—may be a friend of Darci's, although it is more likely she is either a family member or a friend of Darci's sister Deena. For purposes of this analysis, however, the court will assume that Lori is Darci's loud–mouthed friend. Lori swears frequently, and adds some comedic elements to the script. Darci meets Lori and family members at the spa, completely covered to avoid the sun; Lori comments: "Ooh. Sexy." When Darci says the two will have to "see who[ is] old and wrinkled twenty years from now," Lori responds: "Fuck that. I'm *already* old and wrinkled." [200] Lori also injects comedy when Darci talks about Brian. After someone says they heard about the break-up with Brian, the following dialogue ensues:

> "Lori: I, for one, always hated that guy.
> Darci: Um—you introduced me to him.
> Lori: No I didn't.
> Darci: Lori. He's your brother in law.
> Lori: Oh, right. Sorry." [201]
>
> Lori is pregnant and married to a man named Roy, a character who plays a minimal role in the film.[202]

Shame on You appears to believe that Rose is the character in *Walk of Shame* who is similar to Lori. Rose calls Meghan a "dirty hooker" and "cockblocker," and badgers Meghan to go to a nightclub with her and Denise.[203] Outside Meghan's house in Brentwood, Rose does not immediately understand that Kyle has left Meghan and has not simply gone to the supermarket with all of his belongings. Unlike Lori, who is married and pregnant, Rose gets drunk at the nightclub and goes home with a "biker man." The next morning, she says: "This was a mistake. I thought I was

> taking home this cute, younger guy." The biker replies: "Oh, you mean my son. We get confused all the time. Crazy night, huh?" [204]

██ Lori and Rose share certain abstract similarities; arguably, both are loud-mouthed friends of the lead character. This type of abstract similarity is not entitled to copyright protection for reasons already discussed, however. See *Williams*, 84 F.3d at 582 (no copyright protection where there were no similarities "beyond ... superficial similarities" such as age, gender, and relationship as siblings). Moreover, Lori's role in *Darci's Walk of Shame* is limited, and her character is not well developed. Where, as here, characters are indistinct or not well developed, they cannot be afforded copyright protection. See *Lewinson v. Henry Holt & Co., LLC*, 659 F.Supp.2d 547, 566 (S.D.N.Y.2009) ("None of the characters is discussed on more than one page of the work, and the characters' personality traits are undeveloped. The use of such indistinct stock characters does not warrant copyright protection"); *Nichols*, 45 F.2d at 121 (concluding that the depiction of two young lovers was "so faintly indicated" that they were not characters protected by copyright); *Robinson*, 1995 WL 417076, at *9 (concluding that characters were not protectable where the copyrighted work presented no "character development beyond introducing characters clearly derived from a long line of family-based sitcoms").

██ Moreover, a loud-mouthed best friend in a comedy film is a stock charac-

---

200. *Id.* at 15.

201. *Id.*

202. *Id.*

203. WOS at 4.

204. *Id.* at 49.

ter that "flow[s] necessarily or naturally from a basic plot premise, [and] cannot sustain a finding of infringement." See *Cavalier*, 297 F.3d at 823; see also, e.g., *Rice*, 330 F.3d at 1176 ("[W]hile there may exist similarities between the magician 'characters,' any shared attributes of appearance and mysterious demeanor are generic and common"); *A Slice of Pie Prods., LLC v. Wayans Bros. Entertainment*, 487 F.Supp.2d 41, 48 (D.Conn.2007) (noting that uncopyrightable characters and elements such as "FBI agents working undercover, African American characters disguising themselves as Caucasian characters, and men disguising themselves as women, were non-novel concepts used in the film industry long before plaintiff's authors drafted the screenplay"); *Willis*, 2001 WL 1352916, at *2 (the concept of "talent agents who operate in a 'bottom-dwelling ethical nether world, where lying is an art form; insincerity, a science[;] and personal convictions are as commonplace as nose rings' . . . is not original or protectible under the copyright law"); cf. *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1223 (10th Cir.2004) ("Reviewing the record on appeal, it is apparent that the general idea of using a funny and colorful beer vending character to promote beer products is not, in fact, novel").

#### (6) The Dresses

 Shame on You also maintains that the dresses worn by Darci and Meghan are substantially similar inasmuch as both play a predominant role in the screenplay. More specifically, Shame on You contends that the use of a brightly colored dress in a comedy is a copyrightable concept. The court is unconvinced. First, it is unclear that the dress Darci wears is properly described as brightly colored—it may well be pastel; in any event, a brightly colored dress, standing alone, is entirely generic and therefore not a copyrightable concept, especially not in a comedy.[205] See *Gaiman*, 360 F.3d at 660; cf. *Reece v. Island Treasures Art Gallery, Inc.*, 468 F.Supp.2d 1197, 1207 (D.Haw.2006) ("Further, the dancer's hula kahiko dress is *scenes a faire*"); *Winfield Collection Ltd. v. Gemmy Indus. Corp.*, 311 F.Supp.2d 611, 616–17 (E.D.Mich.2004) ("That is, the pointed hat, the flowing cape, the curled boots, the dominant black color of the clothing, as well as the broom, are all elements that follow from the witch theme. These elements are routinely expressed in a wide variety of traditional witch figures, images, and costumes that are commonly employed during the Halloween season as well as in witch characters such as the 'Wicked Witch of the West' in the *Wizard of Oz* and the main character in the cartoon *Broom Hilda*").

The dresses, moreover, are not similar. Meghan wears what is repeatedly described as a short, brightly colored cocktail dress, which leads to her being called a prostitute. By contrast, Darci's dress is described as a hideously ugly, frilly pink, southern belle bridesmaids dress. Beyond the general concept of a woman wearing a dress, and—perhaps—the fact that both are "brightly colored," there is no similarity between the dresses.

#### (7) Conclusion Regarding the Characters

In sum, the only similarities between the characters in *Walk of Shame* and *Darci's Walk of Shame* are abstract and generalized. To the extent any of the characters are sufficiently developed, they share no articulable similarities. Thus, none has protectable similarities.

---

**205.** For example, the cover of the 2011 comedy *Bridesmaids* depicts a number of women that are roughly Meghan and Darci's age, five of whom are wearing bright pink bridesmaids dresses. The concept is generic or stock, and entitled to no copyright protection.

### h. Weighing the Factors

The only articulable similarities between the two works are the fact that each lead character has her car towed to a tow lot and engages in similar dialogue with a tow lot employee, and the fact that each lead character is ultimately transported by helicopter to (or close to) her final destination. As noted, although not sufficiently general to constitute scènes-à-faire, towing the lead character's car and using a helicopter as a mode of transportation, if not completely foreseeable, certainly are not unique choices in an outlandish comedy involving a walk of shame. Moreover, the helicopter scenes are entirely different, given that Meghan's and Gordon's helicopter ride is not depicted, but merely discussed. Likewise, the similar dialogue that takes place at the towing lots consumes no more than a few minutes in each work. Therefore, even when the scene at the tow lot and the helicopter ride are considered, the court cannot conclude that there are triable issues respecting substantial similarity. As was the case in *Benay* and *Funky Films,* despite isolated similarities, the two works tell decidedly different stories, and lack substantial similarity as a matter of law. See *Benay,* 607 F.3d at 625 ("The Benays point to a number of similarities between the Screenplay and the Film. Both have identical titles; both share the historically unfounded premise of an American war veteran going to Japan to help the Imperial Army by training it in the methods of modern Western warfare for its fight against a samurai uprising; both have protagonists who are authors of non-fiction studies on war and who have flashbacks to battles in America; both include meetings with the Emperor and numerous battle scenes; both are reverential toward Japanese culture; and both feature the leader of the samurai rebellion as an important foil to the protagonist. Finally, in both works the American protagonist is spiritually transformed by his experience in Japan. We agree with the district court that '[w]hile on cursory review, these similarities may appear substantial, a closer examination of the protectable elements, including plot, themes, dialogue, mood, setting, pace, characters, and sequence of events, exposes many more differences than similarities between Plaintiffs' Screenplay and Defendants' film.' The most important similarities involve unprotectable elements. They are shared historical facts, familiar stock scenes, and characteristics that flow naturally from the works' shared basic plot premise. Stripped of these unprotected elements, the works are not sufficiently similar to satisfy the extrinsic test"); *Funky Films,* 462 F.3d at 1081 ("At a very high level of generality, both works share certain plot similarities: the family-run funeral home, the father's death, and the return of the 'prodigal son,' who assists his brother in maintaining the family business. But '[g]eneral plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind.' Beyond that, '[t]he stories do not share any detailed sequence of events.' The similarities recounted throughout appellants' brief rely heavily on *scenes à faire*—not concrete renderings specific to 'The Funk Parlor'—and are, at best, coincidental. Consequently, the two works are not substantially similar"); *DuckHole Inc. v. NBC Universal Media LLC,* No. CV 12–10077 BRO (CWx), 2013 WL 5797279, *7 (C.D.Cal. Sept. 6, 2013). ("There are two similar story fragments. The Court, however, agrees with Defendant that 'a Halloween costume contest for pets at the clinic, and an issue about a pet eating chocolate,' do not provide a basis for substantial similarity"); *Gilbert v. New Line Prods., Inc.,* No. CV 09–02231 RGK (RZx), 2010 WL 5790628, *9 (C.D.Cal. Aug. 13, 2010) ("The Court recognizes that some similarities exist. For example, in both

screenplays, the mothers incessantly call their sons, fake illnesses to draw their sons away, bring back their sons' ex-girlfriends, and hire a private investigator to search into Julia and Charlie's past. They also do their sons' laundry and live in the same building as their sons. Both Julia and Charlie seek advice from friends and therapists as they struggle with the mothers in law. There are also some shared generic themes of family, relationships, and love, as well as a similar narrative pace. The majority of the asserted similarities, however, flow from the screenplays' shared generic plot of mothers who scheme to derail their sons' pending marriage to women who the mothers disapprove of. . . . Removing these irrelevant similarities from the Court's consideration, the remaining similarities are insufficient to overcome the differences in order to satisfy the extrinsic test.") aff'd, 490 Fed.Appx. 34 (9th Cir. Jul. 23, 2012).

#### i. *Metcalf v. Bochco*

At the hearing, Shame on You argued that the Ninth Circuit's decision in *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002), required that a jury decide its copyright infringement claim. *Metcalf* is readily distinguishable. There, summarizing the works in question, the Ninth Circuit noted:

> "The similarities between the relevant works are striking: Both the Metcalf and Bochco works are set in overburdened county hospitals in inner-city Los Angeles with mostly black staffs. Both deal with issues of poverty, race relations and urban blight. The works' main characters are both young, good-looking, muscular black surgeons who grew up in the neighborhood where the hospital is located. Both surgeons struggle to choose between the financial benefits of private practice and the emotional rewards of working in the inner city. Both are romantically involved

with young professional women when they arrive at the hospital, but develop strong attractions to hospital administrators. Both new relationships flourish and culminate in a kiss, but are later strained when the administrator observes a display of physical intimacy between the main character and his original love interest. Both administrators are in their thirties, were once married but are now single, without children and devoted to their careers and to the hospital. In both works, the hospital's bid for reaccreditation is vehemently opposed by a Hispanic politician." *Id.* at 1073–74.

The court held that "the similarities . . . [were] not protectable when considered individually [because] they [we]re either too generic or constitute[d] 'scenes a faire.' " *Id.* at 1074. It noted, "[h]owever, [that] the presence of so many generic similarities and the common patterns in which they ar[o]se . . . help[ed] the Metcalfs satisfy the extrinsic test." *Id.* Stated differently, it held that "[t]he totality of the similarities . . . [went] beyond the necessities of the . . . theme and belie[d] any claim of literary accident," and that the "cumulative weight of the[ ] similarities allow[ed] the Metcalfs to survive summary judgment." *Id.*

Shame on You has never argued, nor has the court found, that there are any "striking" similarities between the two works at issue in this case. Cf. 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 13.02[B] (2005) ("At base, 'striking similarity' simply means that, in human experience, it is virtually impossible that the two works could have been independently created"). "In *Metcalf,* unlike this case, the 'generic similarities' were voluminous, nearly identical, and occurred in the same pattern. Here, in contrast, [most] of the elements [Shame on You]

points out are not similar when viewed in context." *Gable v. Nat'l Broad. Co.*, 727 F.Supp.2d 815, 843–44 (C.D.Cal.2010) aff'd, 438 Fed.Appx. 587 (9th Cir. June 16, 2011) (Unpub.Disp.). Shame on You has not cited "any common pattern of unprotected elements in [*Walk of Shame*] that also appears in [*Darci's Walk of Shame*] in the sort of magnitude contemplated by *Metcalf.*" *Id.* See also *Satava v. Lowry*, 323 F.3d 805, 811–12 (9th Cir.2003) (distinguishing *Metcalf* because "a combination of unprotectable elements is eligible for copyright protection only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship"); *Zella v. Scripps Co.*, 529 F.Supp.2d 1124, 1137 (C.D.Cal.2007) (noting that "many courts have been reluctant to expand [copyright protection for a pattern of unprotected elements in literary works] beyond the clear-cut case in *Metcalf,*" and granting summary judgment for defendants where plaintiff "cobbled together" a list of generic elements that did not form a specific pattern); *Identity Arts v. Best Buy Enter. Servs. Inc.*, No. CV 05–4656 PJH, 2007 WL 1149155, *28 (N.D.Cal. Apr. 18, 2007) (declining to apply *Metcalf* where works shared only a few "striking similarities," and, broadly speaking, a similar sequence of events because "the cumulative weight" of the alleged similarities paled in comparison to that in *Metcalf*), aff'd, 320 Fed.Appx. 772 (9th Cir. Apr. 1, 2009) (Unpub.Disp.); *Flynn v. Surnow*, No. CV 02–9058–JFW (PLAx), 2003 WL 23411877, *9 (C.D.Cal. Dec. 9, 2003) (rejecting a comparison to *Metcalf* where the similarities between works were "randomly scattered throughout the works and ha[d] no concrete pattern … in common").

*Metcalf* is therefore distinguishable, and does not save Shame on You's copyright

claim from dismissal. See *Funky Films*, 462 F.3d at 1081 ("'No amount of proof of access will suffice to show copying if there are no similarities,' and, in this case, additional discovery would not change the fact that the two works lack any concrete or articulable similarities," quoting *Krofft*, 562 F.2d at 1172); *Williams*, 84 F.3d at 590 ("[R]andom similarities scattered throughout the works … cannot [by themselves] support a finding of substantial similarity").

The court therefore concludes that there is no substantial similarity between plaintiff's and defendants' works as a matter of law, and that Garner's and Broken Road's motion to dismiss Shame on You's copyright infringement claim must be granted. The court therefore dismisses Shame on You's copyright claims against Garner and Broken Road with prejudice. See *California ex rel. California Department of Toxic Substances Control v. Neville Chemical Co.*, 358 F.3d 661, 673 (9th Cir.2004) ("[D]enial of leave to amend is appropriate if the amendment would be futile," citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

**3. Whether the Court Should Exercise Supplemental Jurisdiction Over Shame on You's Implied–in–Fact Contract Claim**

Shame on You's copyright infringement claim provides the sole basis for federal subject matter jurisdiction in this case, given that both Shame on You and several of the defendants are allegedly California citizens.[206] Section 1367(c)(2) provides that a district court may decline supplemental jurisdiction where the state court claim substantially predominates over the federal claim. See 28 U.S.C. § 1367(c)(2) ("The district courts may decline to exercise supplemental jurisdiction

**206.** FAC, ¶¶ 3–12(b).

over a [state-law] claim [if] ... the claim substantially predominates over the claim or claims over which the district court has original jurisdiction"). Dismissal under this section is proper where "a state claim constitutes the real body of a case, to which the federal claim is only an appendage." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 727, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Thus, "where permitting litigation of all claims in the district court can accurately be described as allowing a federal tail to wag what is in substance a state dog," district courts should decline to exercise supplemental jurisdiction. *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 789 (3d Cir.1995). Here, the court has concluded that the federal copyright claim fails as a matter of law. The implied-in-fact contract claim turns on an altogether different standard. See *Benay*, 607 F.3d at 631("[B]ecause the claim is based in contract, unauthorized use can be shown by substantially similar elements that are not protected under copyright law"); *id.* at 632 (affirming summary judgment on federal copyright claim for lack of substantial similarity; reversing grant of summary judgment on implied in fact contract claim because *scenes-a-faire* and other stock elements can constitute substantial similarities for purposes of implied-in-fact contract claim). The parties, moreover, have not substantially litigated the merits of the implied-in-fact contract claim, devoting a total of no more than handful of pages of briefing to it. Because the federal copyright claim fails as a matter of law, and is based on a different legal standard, principles of comity council strongly against maintaining the implied-in-fact contract claim. See *Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130 ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law"). The court therefore declines to exercise supple-

mental jurisdiction of the implied-in-fact contract claim under § 1367(c)(2). Garner's and Broken Road's motion to dismiss is therefore granted in full.

## J. Whether the Remaining Defendants Are Entitled to Judgment on the Pleadings

Defendants assert that they are entitled to judgment on the pleadings for the same reasons Garner and Broken Road were entitled to dismissal of the claims against them with prejudice, i.e., that the two works lack substantial similarity in protectable expression as a matter of law. The court's conclusion that the two works are not substantially similar applies equally to the remaining defendants. Moreover, given that the court has dismissed the claims against Garner and Broken Road with prejudice, all remaining parties in the action have filed answers, such that the pleadings are closed. *Doe*, 419 F.3d at 1061 ("the pleadings are closed for the purposes of Rule 12(c) once a complaint and answer have been filed, assuming, as is the case here, that no counterclaim or cross-claim is made"). Accordingly, the court grants defendants' motion for judgment on the pleadings on Shame on You's copyright claim.

## III. CONCLUSION

For the reasons stated, Garner's and Broken Road's motion to dismiss is granted as to the copyright infringement claim with prejudice. The court declines to exercise supplemental jurisdiction over Shame on You's implied-in-fact contract claim, and dismisses that claim without prejudice to its refiling in state court. The remaining defendants' motion for judgment on the pleadings on the federal copyright claim is also granted with prejudice. See *Neville Chemical Co.*, 358 F.3d at 673

("[D]enial of leave to amend is appropriate if the amendment would be futile," citing *Foman*, 371 U.S. at 182, 83 S.Ct. 227). Because there are no remaining claims, the court denies Garner's and Broken Road's motion to continue the case management dates as moot.

## JUDGMENT FOR DEFENDANTS

On August 14, 2015, the court entered an order granting defendants Todd Garner's and Broken Road Productions, Inc.'s motion to dismiss plaintiff's federal copyright infringement claim with prejudice, and declining to exercise supplemental jurisdiction over plaintiff's state law implied-in-fact contract claim. The court also granted the remaining defendants' motion for judgment on the pleadings as to the federal copyright infringement claim with prejudice.

Accordingly,

IT IS ORDERED AND ADJUDGED

1. That plaintiff's federal copyright infringement claim be dismissed against all defendants with prejudice;

3. That plaintiff's implied-in-fact contract claim be dismissed without prejudice; and

4. That the action be, and it is hereby, dismissed.